Stewart VARN d/b/a Varn Petroleum
Company, Appellee,

v.

Thomas MALONEY, Appellant.

Stewart VARN d/b/a Varn Petroleum
Company, Appellee,

v.

Mary Crosby MALONEY, Appellant.

Nos. 43583, 43584.

Supreme Court of Oklahoma.

Oct. 30, 1973.

Brewer, Worten & Robinett, Bartlesville, for appellee.

Matthew J. Kane, Pawhuska, and Crowe, Dunlevy, Thweatt, Swinford, Johnson & Burdick, Oklahoma City, for appellants.

WILLIAMS, Vice Chief Justice.

In these cases, plaintiff, Stewart Varn, sued the defendants, Thomas J. Maloney and Mary Crosby Maloney, for amounts allegedly past due and unpaid under an oil production operating agreement. Although the defendants are husband and wife, the actions were separately filed. However, in all pertinent details, the pleadings and evidence were identical in the two cases, which were tried together, and have been briefed together on appeal. Judgment was for plaintiff and defendants appeal.

Plaintiff alleged that defendants were the owners of described fractional undivided interests in the oil and gas leasehold of certain lands in Washington County hereinafter called the Ramona Field Prospect, and that under an operating agreement they signed with him, they were liable to him as the operator for their proportionate share of the costs of operating the lease. He alleged that defendants had paid their share of the operating expenses until November, 1966, after which they refused to make further payments. He asked for judgment for each defendant's share of the accrued costs, and of the costs to accrue by date of judgment.

In each case, defendant filed an answer and cross-petition. The answers were general denials with affirmative allegations that defendants were induced to invest and participate in the Ramona Field Prospect by representations contained in a certain report which Varn sent to them through the United States mail; they also alleged that Varn traveled in interstate commerce from Kansas to New Jersey and New York to solicit their participation in the project. They alleged that because of Varn's representations they were led to believe that investment in the Ramona Field Prospect was a "minimal risk"; that Varn, as a man of long experience in the oil business, knew or should have known that " * * * said Ramona Field Project had only a minimal chance of success and that the said Varn did purposely and with intent to create a misconception in the mind of the investors misrepresent said project". They further alleged that they believed and relied upon Varn's false representations and that they would not have invested in the venture "except for the false and negative representations of the plaintiff, Varn".

The cross-petitions adopted by reference all of the allegations of the answers and made other allegations not necessary to be considered in this opinion.

Defendants prayed that plaintiff take nothing by reason of his petition; that the operating agreements be declared null and void; or, in the alternative, that defendants be allowed counter-claims or set-offs in the amounts that their contributions to the project exceeded the oil payments they had received.

The Ramona Field Prospect was a waterflood operation in about 480 acres of the old Ramona Field in Washington and Osage Counties, which had been drilled between about 1905 and 1929. The operating agreements by which defendants agreed to invest in, and participate in, the waterflood operation were signed in October, 1965. The uncontradicted evidence was that prior to that time, after Varn had acquired about 78% of the working interest in the 480 acres, which were all in Washington County, he sent a "Memo to Participants" con-

cerning the "Ramona Field Prospect" to defendants through the mails. This instrument included the following language (all emphases added):

"The acquisition of this prospect is the culmination of plans foremost in our schedule since becoming active in this area with the Candy Creek Prospect. A combination of thick, *highly saturated sand,* along with high permeabilities in these offshore sandbar deposits has resulted in *spectacular flood projects,* which generate big *cash flow* and *high total recovery.* (See Bartlesville Sand trend map).

"We have frequently mentioned the Shell Oil Co. Ramona Field Waterflood Project since it is so near our Candy Creek Prospect and closely resembles it geologically. It has recovered some 3,500,000 barrels of oil by means of waterflood and is averaging some 58,000 barrels of oil per month from about 60 wells.

"This new venture has a number of very attractive aspects, some of which are outlined here:

"1. We are working in an area and on a sandbar development that has already proven its merit.

"2. By utilizing the sale and leaseback of equipment, along with oil payments, we have almost succeeded in purchasing the project with its own assets.

"3. Most of the cost is intangible as capital equipment cost is largely eliminated through equipment leasing.

"4. Much of the cost of implementing the flood will be paid from income, keeping out-of-pocket cost at a minimum.

"5. *Risk is minimal* as the *same zone* is being flooded with *spectacular success* nearby, and we are working with a reservoir, which is an extension of this same sandbar system.

"6. To enable a larger number to participate, we are setting minimum participation at 2%, with even percentages above this (i. e., 3%, 4%, 5%, etc.). We reserve the right to limit participation and the offer is subject to prior sale.

" * * *

"This reservoir was originally drilled during the Eastern Oklahoma boom days by predecessors of Tidewater Oil Co. Primary recoveries were sizeable, but the practice in those days of producing wells at maximum capacity quickly depleted and wasted reservoir pressure, leaving such *recoverable oil* in place. This is, of course, an advantage now as there is more oil that *can be recovered by waterflooding. Waterflooding* is simply an *economical and efficient means* of creating an artificial pressure to force more oil.

" * * *

"We have an *ideal situation* in that we can look to the *experience record of Shell* in repressuring the reservoir with outstanding recovery and profitable production."

In other paragraphs of the memo, and chiefly upon the basis of Shell's recovery in its nearby waterflood project in the same oil field, Varn predicted a total recovery of 1,500,000 barrels of oil and, on that basis, included a table on "Investment and Tax Analysis" predicting a net profit of $1,875,000, of which only $1,275,000 would be taxable after the statutory depletion allowance. In another table showing the "tax effect" of the investment on an investor in the 50% income tax bracket, he predicted an "after tax" return *in a ratio of 21.6 to 1.* He said that "We are implementing the flood on about 50% of the wells in the initial phase" and that "We anticipate fillup and flood effect early in 1966".

Varn started operating the Ramona Field Prospect late in 1965 or early in 1966. The first water was pumped into it in February, 1966. Pumping continued for about 14 or 16 months and "flood effect" was never achieved. In July, 1967, Varn

wrote the defendants that the project had never responded to the waterflood and that he had been wrong initially in assuming that he would not have to fill the gas cap in the reservoir in order to exert pressure on the oil. In May, 1968, he wrote that he was going to shut the project down on June 1, 1968, and that he was trying to sell the property.

During the period when Varn was operating the project, total production of oil amounted to only about 100 or 200 barrels.

In the "Memo to Participants" in which Varn solicited the participation of defendants in the project, nothing at all was said about the existence of the gas cap or the possible necessity of filling it with water before flood effect would occur.

The geological investigation in connection with the proposed project was done for Varn by a geologist and long-time employee, Mr. D. As a witness for plaintiff, he testified that his investigation was made during the period between March and July, 1965. He physically inspected the area, studied the well logs on the old wells actually located in the 480 acres, and also studied the Corporation Commission and Osage Agency records pertaining to the Shell and Marathon waterflood projects, both less than half a mile from the Ramona Field Prospect. On the basis of these studies, and without talking with Shell employees or officials about the Shell project, he formed a "guestimate" that it took Shell about two years to achieve flood effect on its project, and testified that information about the lengthy fillup period on the Shell project was common knowledge in the area. When asked whether he thought the proposed project was a "minimal risk", Mr. D said "We didn't say that, did we?" Later he testified that he thought the Ramona Field Prospect would successfully flood because Shell had a successful waterflood "on the same sand bar". Still later he testified that he meant "same bar trend" instead of "same sand bar".

Mr. S., a geologist with eighteen years' experience in northeastern Oklahoma oil fields whose qualifications as an expert witness are unquestioned, testified for defendants. He said that a "standard geological investigation" of the area would include going to "the person next door" to find out what had been done. In answer to a question as to the risk involved in the proposed Ramona Field Prospect, he testified unequivocally that "There is much more than a minimal risk in a waterflood * * *".

After the court sustained an objection to a question which might have been construed as not calling for a professional opinion, Mr. S agreed that if permitted to testify, he would say that in his opinion as a professional geologist, there would be "considerable hesitancy" in recommending the acquisition of a property "that close to a major oil company's property", "for the simple reason that having been there all those years and having experience with the property they would normally and naturally acquire it if they deemed it profitable". There was no objection to the offer of proof.

Mr. Varn admits he received $2500.00 from Mr. Maloney and $1,000 from Mrs. Maloney for the 5% and 2% interests in the Ramona Field Prospect he caused to be vested in them; and admits they paid their proportionate share of the expenses Varn incurred as operator of the Prospect for some ten or twelve months, next after their purchase of their interests. In addition, herein, he claims they owe him $5,551.86 and $2,293.71 for operating expense up to June 20, 1968, and June 1, 1968, respectively. However, even he does not claim that during all that time they received (from his corporation set up on instructions of his accountant) their proportion of more than the 200 barrels of oil that he says were produced by that Prospect. Another witness said all such production would not exceed 100 barrels.

There was evidence introduced in the trial of effect that there were previously drilled holes in the Prospect area which had not been plugged and which allowed

escape of the water injected under pressure in an attempt to flood the Prospect, as well as the gas cap which overlaid the supposed reservoir of oil.

At the time of pronouncing judgment for plaintiff the trial judge commented that Varn's representations were "extreme puffing maybe and absurd or extreme, at least * * * but certainly he didn't guarantee that these dreams were going to come true".

■ The essential elements of fraud are well settled. The proof must show a material false representation, made with knowledge of its falsity or recklessly without knowledge as to its truth or falsity, as a positive assertion, with the intention that it be acted upon by another, who does act in reliance thereon, to his injury. Rucker v. Tietz, Okl., 376 P.2d 341; Johnson v. Eagle, Okl., 355 P.2d 868; Ramsey v. Fowler, Okl., 308 P.2d 654. No "guarantee" is required.

■ It is equally well settled that the concealment of material facts which one is bound under the circumstances to disclose, may constitute fraud; 37 Am.Jur.2d Fraud and Deceit, § 144. In Deardorf v. Rosenbusch, 201 Okl. 420, 206 P.2d 996, this Court held:

"A duty to speak may arise from partial disclosure, the speaker being under a duty to say nothing or to tell the whole truth. One conveying a false impression by the disclosure of some facts and the concealment of others is guilty of fraud, even though his statement is true as far as it goes, since such concealment is in effect a false representation that what is disclosed is the whole truth."

■ After a careful consideration of the entire record before us, we are forced to the conclusion that Varn's unqualified statements that "We are working . . . on a sandbar development that has already proven its merit" and that "Risk is minimal * * *" were false statements of material facts which, under the circumstances, amounted to fraud as defined above. We also conclude that his failure to mention the gas cap and the possible necessity of filling it with water before flood effect would occur, as indicated by the "experience record of Shell" which was common knowledge in the area and the failure to mention the unplugged wells in the immediate area which permitted loss of water and pressure, amounted to a concealment of material facts, which he was bound under the circumstances to disclose. His liberal use of the "experience record of Shell" to support his glowing predictions of a high total recovery and a return of over 21 to 1 to an investor in the 50% income tax bracket, coupled with his failure to mention the gas cap and unplugged holes in the area and the lengthy fillup period indicated by the same "experience record", emphasized the deceitful nature of the "Memo to Participants", especially in view of the statement that "We anticipate fillup and flood effect early in 1966".

■ In the answer brief, plaintiff argues that defendants failed to prove that they relied upon his representations. However, it is well settled that the fact of reliance may be inferred from other facts in evidence, 37 C.J.S. Fraud § 120 at page 446, and the character of the representations may be considered in determining whether they were probably relied upon, 37 Am.Jur.2d Fraud and Deceit, § 223; also, the circumstances attending the transaction may properly be considered; 37 Am.Jur.2d Fraud and Deceit, § 448.

■ Considering all the facts and circumstances in these cases, the technical nature of waterflood operations in general and the experience record of Shell in particular, and the fact that Varn, a man of wide experience in the oil business, gave defendants a "hard sell" and that he was "on the scene" and defendants were far away, we hold that defendants' reliance upon the false representations was properly shown by the evidence.

Plaintiff also argues that the counterclaims asserted by the defendants in their cross-petitions are barred by applicable

limitations. However, as defendants concede in their reply briefs, their evidence was insufficient to establish the amount of their counterclaims under the cross-petitions, and the judgments against them on on the cross-petitions must be affirmed for that reason. It is therefore unnecessary to consider the limitations question.

In each case, the judgment of plaintiff and against defendant on plaintiff's petition is reversed and the judgment for plaintiff and against defendant on defendant's cross-petition is affirmed.

DAVISON, C. J., and IRWIN, BERRY, LAVENDER, BARNES, and SIMMS, JJ., concur.