**TARA PETROLEUM CORPORATION,**
**Jarrett Oil Company, Appellants,**

v.

**Chester HUGHEY, Individually and as Administrator of the Estate of William F. Hughey, Deceased, Coy Brown, W. E. Pugh, James D. Howard, Dick Steelman, and Wilcoy Petroleum Company, Appellees.**

No. 53585.

Supreme Court of Oklahoma.

June 9, 1981.

Rehearing Denied July 28, 1981.

Sparks & Sparks, Tulsa, for appellants.

Yonne P. McDaniel, Mangum, for appellee, Chester Hughey, Individually and as Administrator of the Estate of William F. Hughey, Deceased.

John C. Buckingham, Oklahoma City, for appellees, Coy Brown, W. E. Pugh, James D. Howard, Dick Steelman, and Wilcoy Petroleum Company.

LAVENDER, Justice:

This appeal is from a judgment of the District Court of Greer County, Oklahoma, awarding $18,000 in additional royalties under an oil and gas lease to the plaintiff-lessor.

The property involved is described as lots 3 and 4 and the south half of the northwest quarter of section 5, township 5 north, range 23 west of the Indian Meridian, Greer County, Oklahoma. It contains some 161 acres.

In 1973 the four lessors, as the sole heirs of William F. Hughey, deceased, executed the lease to Tara Petroleum Corporation ("Tara"). Six months later Tara assigned the lease to an individual, Coy Brown, reserving an overriding royalty of ⅛ of the ⅞ working interest and reserving the right to purchase any gas produced at 31¢ per mcf.

In 1974 Coy Brown drilled a well on the property,[1] but it was not a producer. Then in February of 1976 he assigned the lease to Wilcoy Petroleum Company ("Wilcoy"), a corporation owned by him, his wife Wilma, his brother-in-law W. E. Pugh, and Pugh's wife Maudine. In addition to the one to Wilcoy, there also appears of record another assignment of the lease from Coy Brown, this one dated and filed May 19, 1976, in which Brown reserved an interest in the lease and assigned decimal interests to W. E. Pugh, Dick Steelman, and James D. Howard.[2]

Wilcoy—apparently with the financial help of Steelman and Howard—drilled a producing gas well on the property in February 1976. In that same month Wilcoy, as seller, entered into a gas purchase contract with Jarrett Oil Company ("Jarrett") as the buyer. The contract was for two years and extended automatically from year to year thereafter. It could be terminated at the end of the two-year period or on any anniversary of that date upon ninety days notice by either party.

Production from the Hughey well began in March of 1976. Although the gas purchase contract called for the seller, Wilcoy, to pay "all royalties, overrides and production payments," the buyer, Jarrett, made the actual payments. At the end of the two-year period, Wilcoy terminated the contract.

It is the royalties for those two years— March 1976 through February 1978—that concern us in this action. They were based on the contract price Jarrett paid Wilcoy for the gas: 32¢ per mcf the first year, 33¢ the second, adjusted for BTU content. During that time Jarrett sold the gas from the Hughey well, and other gas it purchased in the field, to El Paso Natural Gas Company. Jarrett's contract with El Paso Natural Gas provided for Jarrett to receive for its gas the ceiling price permitted by the Federal Power Commission. Nearly five months after Jarrett began purchasing gas from the Hughey well, the Federal Power Commission substantially raised the ceiling price. Thereafter Jarrett received much more from El Paso Natural Gas than the 32¢ or 33¢ it paid Wilcoy for the gas from the Hughey well. The price went as high as nearly $1.30 per mcf.

---

1. There is an indication in the record that Brown was joined in this drilling venture by his brother-in-law, W. E. Pugh.

2. These conflicting assignments are not explained, but they evidently have not caused any confusion or problems for the parties.

The lessors felt that they were owed additional royalties for this two-year period. Their lease has a more or less standard "market price" royalty clause for gas. It reads:

> In consideration of the premises the said lessee covenants and agrees:
>
> .    .    .    .    .
>
> 2nd.   To pay lessor for gas of whatsoever nature and kind produced and sold or used off the premises, or used in the manufacture of any products therefrom, one-eighth (⅛) *at the market price at the well* for the gas sold, used off the premises, or in the manufacture of products therefrom, said payments to be made monthly.... [Emphasis added.]

Under this clause the lessors asserted that they were entitled to have their royalties measured by the price El Paso Natural Gas paid Jarrett, rather than the contract price Jarrett paid Wilcoy.

The lessors sued the original lessee (Tara), the first purchaser of the gas (Jarrett), and Wilcoy, Brown, Pugh, Steelman, and Howard (collectively referred to as the "producers"). Another defendant, Falcon Oil and Gas Company, was let out of the suit, and all but one of the original plaintiff-lessors dismissed their actions. The trial court held for the remaining plaintiff against Tara and Jarrett, awarding a joint and several judgment for $18,000 for additional royalties. The court held for the producers on the plaintiff's actions against them. Tara and Jarrett appeal.

## I.

Disputes between lessors and lessees over the amount of royalty to be paid on gas production have become relatively common. The kind of dispute we have before us today arises because lessees, in order to market the gas, must ordinarily enter into long-term gas purchase contracts. As the current price of gas increases, lessors with more recent leases, more recent wells, and more recent gas purchase contracts receive royalty on higher prices than their counterparts with older production. Understandably, this seems unfair to the lessors.

Here the plaintiff did not ask for additional royalties based on a price that other lessors received for their gas, he asked for additional royalties based on what was actually paid for his gas. A middleman—Jarrett Oil Company—is present here. Nevertheless, the question is the same: Is a lessor with a "market price" gas royalty clause[3] entitled to have his royalty calculated on the highest current price in the field? Put another way, is the "contract price"—the price the producer gets according to the gas purchase contract—the "market price" under the lease?

We hold that it is. In doing so, we recognize at the outset that some other jurisdictions have held otherwise. They are the Fifth Circuit,[4] Texas,[5] Kansas,[6] and Montana.[7] The cases from these jurisdictions

---

3. Other typical gas royalty clause types are "market value," "proceeds" ("gross" and "net"), and "in kind" clauses. *See generally* R. Hemingway, Oil and Gas § 7.4, at 316–21 (1971); Ashabranner, *The Oil and Gas Lease Royalty Clause—One-Eighth of What?*, 20 Rocky Mtn.Min.L.Inst. 163, 168–88 (1975); Fischl, *Ascertaining the Value or Price of Gas for Purposes of the Royalty Clause*, 21 Okl.L. Rev. 22, 22–32 (1968); Morris, *Taking Royalty Gas in Kind*, 22 Rocky Mtn.Min.L.Inst. 993, 994–97 (1976); Comment, *Vela: Legacy of Conflict Over Determination of Market Value for Royalties on Intrastate and Interstate Gas and Continued Controversy With the Natural Gas Policy Act of 1978*, 11 St. Mary's L.J. 502, 502 n.4 (1979). We limit our decision today to the effect of a "market price" gas royalty clause.

4. *Foster v. Atlantic Refining Co.*, 329 F.2d 485 (5th Cir. 1964); *J. M. Huber Corp. v. Denman*, 367 F.2d 104 (5th Cir. 1966). These are the seminal cases.

5. *Texas Oil & Gas Corp. v. Vela*, 429 S.W.2d 866 (Tex.1968). This is the original Texas case. It spawned a number of later Texas state and federal cases.

6. *Lightcap v. Mobil Oil Corp.*, 221 Kan. 448, 562 P.2d 1, *cert. denied*, 434 U.S. 876, 98 S.Ct. 228, 54 L.Ed.2d 156 (1977).

7. *Montana Power Co. v. Kravik*, 586 P.2d 298 (Mont.1978).

have generated a fair amount of comment,[8] including comment by Oklahoma authors.[9] By and large, the results in those cases have been criticized.[10]

■ Once a producing well is drilled, a producer has a duty to market the gas.[11] In order to market gas it is usually necessary to enter into a gas purchase contract—frequently a long-term one, much longer than the term of the contract involved in this case. We have recognized this necessity of the market,[12] and we believe that lessors and lessees know and consider it when they negotiate oil and gas leases. Lessors and lessees also know that during the term of a gas purchase contract gas prices may increase, perhaps substantially. During the term a producer's revenues, fluctuations in production aside, will not increase. Yet if royalty must be paid on the basis of a "current," steadily-increasing "prevailing" price, then the lessor's share will take an ever larger and larger proportion of the producer's revenues. Consider for example the situation in this case: Under their contract the producers received 32¢ per mcf the first year. The royalty share of that amount, one eighth, is 4¢. Yet by the end of the first year the first purchaser, Jarrett, was receiving nearly $1.28 for the gas. One eighth of $1.28 is 16¢. So if royalty were measured by the price El Paso Natural Gas paid Jarrett, the lessors' royalty would have quadrupled in one year—to one half of the producers' revenues. And all the while, of course, the producers' revenue per mcf remained constant.

■ This would not be fair to the producers. We do not believe that the lessors in this case, the original lessee, or the assignee-producers ever contemplated that the lessors' royalty could be half of what the producers received for the gas. The better rule—and the one we adopt—is that when a producer's lease calls for royalty on gas based on the market price at the well and the producer enters into an arm's-length, good faith gas purchase contract with the best price and term available to the producer at the time, that price is the "market price" and will discharge the producer's gas royalty obligation.[13] As one respected author has said:

Conceding that competent parties should be held to their agreements even though improvident, the typical clause, as a minimum, seems to be freighted with inherent ambiguity when it is remembered that gas must be sold by long term contracts in which buyers have been able to obtain schedules of prices almost certain to get out of line with contemporary contracts being negotiated. It was this consideration which caused gas sellers, where they were able, to insist on the "most favored nations" clauses now outlawed by the Federal Power Commission

---

8. Hamilton, J., dissenting in *Texas Oil & Gas Corp. v. Vela*, 429 S.W.2d 866, 879–80 (Tex. 1968); Preslar, C. J., dissenting in *Butler v. Exxon Corp.*, 559 S.W.2d 410, 418–20 (Tex.Civ. App.1977); 3A W. Summers, Oil and Gas § 589 (2d ed. W. Flittie Supp. 1980); 3 H. Williams, Oil and Gas Law § 650.4 (1977); Harmon, *Vela Today: Market Value Royalty Problems*, 27 Oil & Gas Tax Q. 185, 189–204 (1978).

9. Ashabranner, *The Oil and Gas Lease Royalty Clause—One-Eighth of What?*, 20 Rocky Mtn. Min.L.Inst. 163, 175–85 (1975); Fischl, *Ascertaining the Value or Price of Gas for Purposes of the Royalty Clause*, 21 Okl.L.Rev. 22, 30–32 (1968); Morris, *The Gas Royalty Clause—What Is Market Value?*, Sw. Legal Foundation 25th Ann. Inst. on Oil & Gas L. & Tax. 63, 66–79 (1974).

10. Hamilton, J., *supra* note 8; Preslar, C. J., *supra* note 8; 3A W. Summers, *supra* note 8;

Fischl, *supra* note 9, at 34–36; Harmon, *supra* note 8, at 205–08; Morris, *supra* note 9, at 75–83.

11. *McVicker v. Horn, Robinson & Nathan*, 322 P.2d 410, 414 (Okl.1958). *See generally* Annot., 71 A.L.R.2d 1219 (1960).

12. *Apache Gas Products Corp. v. Oklahoma Tax Commission*, 509 P.2d 109, 113 (Okl.1973). Texas courts have as well. *Gex v. Texas Co.*, 337 S.W.2d 820, 828 (Tex.Civ.App.1960); *Texas Oil & Gas Corp. v. Vela*, 405 S.W.2d 68, 73 (Tex.Civ.App.1966), *quoted in Texas Oil & Gas Corp. v. Vela*, 429 S.W.2d 866, 878–79 (Tex. 1968) (Hamilton, J., dissenting).

13. Fischl, *Ascertaining the Value or Price of Gas for Purposes of the Royalty Clause*, 21 Okl.L.Rev. 22, 29 (1968).

in current contracting of jurisdictional sales by the device of refusing filing. to such contracts. (In *Vela*, a life of the lease sales contract at 2.3¢ per MCF, conceded to be reasonable in the circumstances of 1935 when made, had gotten approximately 11¢ out of line by 1960.) Add to this well-known reality of the business the lessee's implied covenant obligation to market with dispatch, and in the opinion of the writer the ambiguity should be resolved in favor of the lessee as a matter of law, with inquiry restricted to whether the sale was a reasonable contract when made.[14]

■ We believe that our interpretation of "market price" is consonant with the intent and understanding of parties to oil and gas leases. And it is the only interpretation that would operate fairly for producers. Moreover, it is not unfair to lessors. Quite naturally lessors want to receive as much royalty as possible, but lessees in their own interest seek as good a price as they can get for gas. As long as the contract was reasonable when entered into, and as long as our law recognizes long-term gas purchase contracts as binding in the face of escalating prices, the law should not penalize the producer who was forced into the contract in large measure by his duty to the lessor. Now if the contract was not reasonable when entered into, if it is not at a minimum fair and representative of other contracts negotiated at the time in the field, then a different result obtains. Then the lessee has not protected his lessor in discharging his duty to market the gas, and there is no policy in the law requiring the courts to protect the lessee in interpreting the lease.

■ The burden of proving that a gas purchase contract was unfair or unreasonable at the time it was entered into is on

the lessor seeking additional royalty. In this case there is no hint that the contract was unfair or unreasonable. The gas from the Hughey well is low in BTU content. In 1976 there were three gas purchasers in the field, but only one—Jarrett—was buying low-BTU gas. The producers made the best deal they could to market the gas. The price they negotiated was the highest being paid in the field at the time. They negotiated an escalator clause, and they obtained a short contract term: two years, as opposed to the ten-year term that was standard with Jarrett's contracts at the time. Of course, the producers were themselves concerned with making the best deal possible, but they acted in good faith and represented their lessors well. They dealt at arm's length with Jarrett. They terminated the contract after two years, when gas prices had increased. And they did not themselves profit in any way from the increases in gas prices. Under these circumstances, we hold that the "market price" in the gas royalty clause of the lease is the same as the "contract price" of the gas purchase contract.

Our holding today is consistent with our holding in an earlier case, *Apache Gas Products Corp. v. Oklahoma Tax Commission*,[15] in which we were construing one of our gross production tax laws, 68 O.S. 1971 § 1009(f).[16] That statute allows the Tax Commission to assess gross production taxes on the "prevailing market price"[17] when the price of gas sold under a gas purchase contract does not represent "the cash price thereof prevailing for . . . gas . . . of like kind, character or quality in the field from which such product is produced . . . ." We held that when the contract price for gas "was the highest and best price obtainable for gas in the field producing it, under the circumstances prevailing at the time the

---

14. 3A W. Summers, Oil and Gas § 589 (2d ed. W. Flittie Supp. 1980, at 22–23).

15. 509 P.2d 109 (Okl.1973).

16. Section 1009 was amended in 1979, 1979 Okl.Sess.Laws ch. 88, § 2, but the language of subsection (f) was not changed.

17. That term, along with "prevailing field price," "prevailing price," and "gross value," was used throughout *Apache Gas* as shorthand for the statutory language in section 1009(f): "the prevailing price then being paid at the time of production thereof in said field for . . . gas . . . of like kind, quality and character."

contract was entered into," [18] for purposes of the gross production tax the contract price is the market price. *Apache Gas* was followed by the Tenth Circuit in a 1976 case, *Pierce v. Texas Pacific Oil Co.*[19]

Since here the contract price is the market price, the lessors were not entitled to additional royalties from the producers. As we have said, the plaintiff did not get any additional royalties from them. His claim against them was denied, and he has not appealed that denial. The plaintiff did, however, get judgment against the producers' original assignor, the original lessee, Tara, and the first purchaser, Jarrett. In the ordinary circumstance, when the lessors are not entitled to additional royalties from the producers they will not be entitled to additional royalties from any other party. That brings us to the plaintiff's equitable argument.

## II.

The plaintiff in this case and the producers have joined on appeal as appellees; they have filed one brief. In it they argue that "equity and fairness will not permit the enrichment of [Tara and Jarrett] to the detriment of the royalty owners ...." They assert that Tara and Jarrett are jointly owned by and subject to the common control of two men, Joe Bob Brown (no relation to Tara's assignee Coy Brown) and Dean McNaughton.

Courts should take care not to allow lessors to be deprived or defrauded of their royalties by their lessees entering into illusory or collusive assignments or gas purchase contracts. Whenever a lessee or assignee is paying royalty on one price, but on resale a related entity is obtaining a higher price, the lessors are entitled to their royalty share of the higher price. The key is common control of the two entities.

The problem in this case is that common control of Tara and Jarrett was not shown. The record before us shows only two things: (1) at the time Tara took the original lease (April 1973) and at the time Tara assigned the lease to Coy Brown (October 1973), Joe Bob Brown and Dean McNaughton each owned 50% of Tara, and (2) at the time of trial (March 1979) Brown owned 100% of Tara and was president of both Tara and Jarrett. There is no indication in the record of the ownership of Jarrett at any time. Obviously we can speculate on Jarrett's ownership, but that is not the function of a court.

Besides the lack of proof of common control in this case, we believe that a different matter is presented when an assignment has been made to or a gas purchase contract negotiated with an independent third party. To be entitled to additional royalties in that instance, we hold that the plaintiff must meet a higher burden of proof. As is ordinarily required for a court to ignore the separate legal existence of two corporate entities, in that instance it must appear

> from an examination of the entire facts, either (1) that the separate corporate existence is a design or scheme to perpetrate fraud, or (2) that one corporation is so organized and controlled and its affairs so conducted that it is merely an instrumentality or adjunct of another corporation. In other words, it must appear that one corporation is merely a dummy or sham.[20]

Nothing of the sort appears in this case. Coy Brown, who took the original assignment from Tara, and the later assignees of Brown, the producers, appear from the record to be completely independent of Tara and Jarrett. Except that Brown was required to drill a well, the assignment was unconditional.[21] At the

---

18. 509 P.2d at 109 (syllabus ¶ 1).

19. 547 F.2d 519, 521 (10th Cir. 1976).

20. *Gulf Oil Corp. v. State*, 360 P.2d 933, 936 (Okl.1961); *Wallace v. Tulsa Yellow Cab Taxi & Baggage Co.*, 178 Okl. 15, 18, 61 P.2d 645, 648 (1936).

21. Tara did reserve a ⅛ of ⅞ override and an option to purchase any gas produced at 31¢ per mcf. The option was never exercised. We expressly decline to decide what the result would have been if Tara had exercised the option.

time of the assignment, there was no well on the property. Tara could not have known that a producing well would be drilled, and in fact Brown's first well was not a producer. There were three companies with pipelines purchasing gas in the field—Tara, Jarrett, and Rimrock Gas Company—and Brown would have been under no obligation to sell gas to any particular one of them. As it happened, however, when the Hughey well did come in the gas was of low BTU content, and only Jarrett had enough of a market to purchase all of the gas. But that appears to have been a matter of circumstance, not contrivance. There is no indication that the producers ever acted under the direction or influence of either Tara or Jarrett. And the fact that Jarrett made the royalty payments for the producers—a common practice in the industry—is not significant. Under these circumstances, Tara and Jarrett should not have been held liable for any additional royalties.

### III.

We reverse the judgments against Tara Petroleum Corporation and Jarrett Oil Company. Several other issues were raised on appeal. They concern Tara and Jarrett's cross-claim against the producers for indemnity, which was denied by the trial court. Ruling as we have, we have not found it necessary to decide those questions.

Tara and Jarrett are awarded their costs.

REVERSED.

BARNES, V. C. J., and HODGES, SIMMS, DOOLIN, HARGRAVE and OPALA, JJ., concur.

IRWIN, C. J., and WILLIAMS, J., dissent.