2004 OK 92

William E. HOWELL, as Trustee of the Howell Family Revocable Trust, Amanda L. Irwin De Martin, individually and as personal representative of the Estate of Georgya Lee Calderon, Anita Sue Loos Zellitti, Betty Frensley, Billy Joe Frensley, Bobbie K. Howell, Daniel E. McCarley, Dean L. McCarley, Dinah L. McCarley, The Hazel Thompson Trust 40%, The Hazel Thompson Trust 60%, J.F. Buck Trust ABC, Jennifer S. Howell, John Ed Mosier, June Mosier Chambliss, Justin Brady Loos, Kenneth S. Howell, Lynn Earl Mosier, Paragon Holding Co., Johnyne Rees, Phillip D. Loos, Richard E. Loos, Robert W. Frensley, Sonya Lynette Meador, William R. Frensley, Susan Frensley, Fran E. Vestal, The Maye Powers Trust, The Patsy A. Hosfeld Trust, Billie Nell Loos, The J.F. Buck Revocable Trust, Doulgas R. Irwin, Jennifer Irwin, Kimberly Kay Loos Rayburn, Jerry Baker, The Deborah Baker Cochran Trust, Angela Baker Steely, Jeffrey Mark Cooper, Leigh Baker Cooper, The Deborah Baker Cochran Childrens Trust, The Jay Allen Satterwhite Revocable Trust, The Betty L. Whitten Trust, The Jerry D. Whitten, Jr., John R. Whitten, The Daisy O. Whitten Trust, Melinda Whitten Craig and Stephen R. Whitten, Petitioners,

v.

TEXACO INC., Texaco Exploration and Production, Inc., Humphreys Unit, Respondents,

Ybles Unit, H.Z. Stiefel Unit, and Milroy Deese Unit, Defendants.

No. 100,164.

Supreme Court of Oklahoma.

Dec. 7, 2004.

Rehearing Denied May 16, 2005.

Henry C. Bonney, Ronald Edward Corley, Bonney Corley LLP, Duncan, OK; Terry J. Barker, R.K. Pezold, Joseph C. Woltz, Gene Guy Boerner, Pezold Barker & Woltz, Tulsa, OK, for Petitioner.

M. Benjamin Singletary, Oliver S. Howard, Richard Billings Noulles, David Edward Keglovits, Gable & Gotwals, Tulsa, OK; Thomas Taylor Ellis, Elbert J. Buckholts, Ellis Leonard & Buckholts, Duncan, OK, for Respondent.

Douglas Burns, Terry Lee Stowers, Burns & Stowers, P.C., Norman, OK, for Amicus Curiae Coalition of Oklahoma Surface and Mineral Owners, Inc.

Mark D. Christiansen, Crowe & Dunlevy, Oklahoma City, OK, for Amicus Curiae Mid-Continent Oil and Gas Association of Oklahoma.

John Richard Reeves, Mock, Schwabe, Waldo, Elder, Reeves & Bryant, Oklahoma City, OK, for Amicus Curiae American Petroleum Institute.

TAYLOR, J.

¶ 1 The issues presented for review are: (1) What is the appropriate method for determining market value of gas at the wellhead if the first arm's-length sale occurs after the gas has been processed; (2) Whether a producer has a fiduciary duty to a royalty owner based solely on a lease and communitization agreement; and (3) Whether there is a genuine issue of material fact that the producer is liable to the plaintiffs for actual and constructive fraud.

## I. PROCEDURAL HISTORY

¶ 2 The plaintiffs are owners of mineral rights in the Sho–Vel–Tum Field, which is primarily located in Stephens and Carter counties in Oklahoma. The plaintiffs filed suit in Stephens County, Oklahoma, against Texaco Inc., Texaco Exploration and Production Inc. (Texaco), the Humphries Unit (collectively respondents), and three other units alleging that they had breached their lease contracts by underpaying royalties, had breached their fiduciary duties, and had committed fraud. The three other units are not part of the proceedings before this Court.

¶ 3 Texaco submits there were three basic types of leases involved in the proceedings before the trial court: (1) leases which base royalty on the market value or proceeds at the prevailing market rate at the mouth of the well or at the well (market value leases), (2) leases which base royalty on the proceeds at the prevailing market rate, and (3) leases which base royalty on a fixed-rate. Texaco moved for partial summary judgment asking the trial court to find that it had met its royalty obligations only as to the market value leases. The other two types of leases were not before the trial court on Texaco's motion for partial summary judgment on the issue of underpayment of royalties and are not part of this Court's review of the issue of underpayment of royalties.

¶ 4 Most of the wells are not subject to a statutory unitization procedure, but a few are. *See* 12 O.S.2001, §§ 287.1–.15. Texaco moved for partial summary judgment on the issue of breach of fiduciary duty against the royalty owners whose wells were not part of an area subject to a unitization order. In the same motion, Texaco asked for partial summary judgment on the issues of actual fraud and constructive fraud against all of the plaintiffs. The trial court granted both of Texaco's motions and certified the order for immediate review. 12 O.S.2001, 952(b)(3). The plaintiffs filed a petition seeking review. This court granted the writ of certiorari.

## II. FACTS

¶ 5 The plaintiffs entered into lease contracts with either Texaco or its predecessor. Some of the wells which are not in a unitized area are in voluntarily communitized areas. The communitization agreements provide for the royalties to be paid on the production in proportion to the acreage owned by each royalty owner. Otherwise, the leases in their entirety remain in force by reason of production on any of the communitized area.

¶ 6 Texaco is the producer of the wells covered by the plaintiffs' leases. Texaco gathered the gas from these leases and processed it at the Velma Plant, which is owned by Texaco's gas plant division. Texaco submits that the gas was marketable at the wellhead. Texaco's production division and Texaco's gas plant division entered into an intra-company "contract" for the sale of the gas covered by the plaintiffs' leases at the wellhead. After the gas was processed, Texaco sold the residue gas and the natural gas liquids to third parties.

¶ 7 In addition to the gas subject to the intra-company contract, Texaco contracted with unaffiliated, third-party producers to purchase gas under percent-of-proceeds (POP) contracts. Under POP contracts, the producer is paid a percentage of the proceeds from the sale of some of the products after processing. An expert considered the amount paid for gas pursuant to the POP contracts with Texaco to be the market value of gas for purposes of royalty payments.

¶ 8 Except for the two-year period between January of 1999 and December of 2000, Texaco computed the plaintiffs' royalty payments on prices established by the intra-company contract. The intra-company contract was based on the POP contracts with the unaffiliated third parties. The intra-company contract prices were at least as much as the prices Texaco paid to third-party producers who sold their gas at the wellhead under POP contracts for processing at the Velma Gas Plant. In calculating the royalty payments, Texaco did not measure, did not account to royalty owners, and did not pay royalty on scrubber oil and drip condensate. Texaco asserts that the scrubber oil and drip condensate are considered in the percentage paid under both the intra-company and third-party POP contracts for residue gas and natural gas liquids.

¶ 9 Beginning in the middle to late 1990s, Texaco generated internal memoranda stating that the royalty payments should be based on 100 percent of the residue gas and natural gas liquids sold. The memoranda further stated: "The market value of the gas will be determined by multiplying the monthly wellhead MMBTU's ... by the weighted average sales price ... per MMBTU received by Texaco ... for residue gas at the tailgate of the plant." It is unclear whether Texaco corrected royalty payments based on the memos. However, in 1999 and 2000, Texaco paid royalties on the sales proceeds of the residue gas and the natural gas liquids.

¶ 10 In 1985, Mobil offered to purchase casinghead gas from Texaco for more than Texaco was paying under its intra-company contract. In a memorandum, Texaco recognized that because the intra-company price was less than Mobil's offer, problems arise when evaluating the intra-company sale. The memorandum concluded with a recommendation that the intra-company sales "include terms equal to or better than" Mobil's offer.

¶ 11 The only communication Texaco had with the royalty owners regarding payments was the check stubs which indicated a sales price but did not show the purchaser or the terms of the intra-company contract. The royalty owners' check stubs did not show that Texaco was deducting a cost for marketing and a profit allowance from the royalty payments. At no time did Texaco disclose to the plaintiffs that it was calculating royalty payments based on its intra-company contract.

## III. THE PARTIES CONTENTIONS

¶ 12 The plaintiffs' arguments are as follows. The market value at the wellhead in this case should be based on the first arm's-length transaction. Here that transaction occurred after the gas was processed. Thus, royalties should be calculated based on the amount Texaco received after processing and should include the amount received for scrubber oil and drip condensate. By failing to pay royalties under the method advocated by the plaintiffs, Texaco breached the lease agreement. Also by failing to inform the plaintiffs of its basis for calculating royalties, Texaco breached its fiduciary duty and committed actual and constructive fraud.

¶ 13 Texaco advocates using the prevailing market price to calculate royalties. To determine the prevailing market price, Texaco determined what other royalty owners received based on its POP contracts with other producers. Texaco asserts that the leases required it to pay the prevailing market price. Texaco reasons that it met its royalty obligation by paying the plaintiffs an amount equal to or more than what other royalty owners whose gas was processed at the Velma Plant were paid.

¶ 14 Texaco argues that, absent special circumstances, a producer has no fiduciary duty to royalty owners and that no special circumstances are present in this case. Texaco also argues because the royalty owners did not rely on Texaco's representations on the check stubs, except for the delay in filing this suit, they cannot recover damages for fraud. Texaco admits and we agree that the intra-company contract is not an arm's-length transaction, that it is not a legal basis on which Texaco can calculate royalty payments, and that there was not an arm's-length sale at the wellhead. However, Texaco does argue that the intra-company con-

tract reflects the prevailing market price of plaintiffs' gas.

## IV. STANDARD OF REVIEW

¶ 15 Under rule 13 of the Rules for District Courts, a court is to grant summary judgment if the moving party shows that there is no genuine issue of any material fact and is entitled to judgment as a matter of law. 12 O.S.2001, ch. 2, app. 1, rule 13. The moving party must propose material facts which it contends are not in dispute and must demonstrate, with references to proper authority, why summary judgment should be granted. *Id.* If the moving party meets·its burden, then the adverse party has the burden of demonstrating the existence of a dispute of material facts. *Hughey v. Grand River Dam Auth.,* 1995 OK 56, ¶ 8, 897 P.2d 1138, 1143. To do so, the adverse party must submit "a concise written statement of the material facts as to which [it] contend[s] a genuine issue exists and the reasons for denying the motion." 12 O.S.2001, ch. 2, app. 1, rule 13.

¶ 16 Both parties must support their positions of the facts with evidentiary material such as affidavits, depositions, and admissions. *Id.* All facts and inferences are to be viewed in the light most favorable to the non-moving party. *Martin v. Aramark Services, Inc.,* 2004 OK 38, ¶ 4, 92 P.3d 96, 97. This Court will review the motion and response thereto *de novo. Fowler v. Norman Municipal Hospital,* 1991 OK 30, ¶ 6, 810 P.2d 822, 824.

## V. ANALYSIS

### A. Market Value of Gas at the Wellhead

¶ 17 Market value is the price negotiated by a willing buyer, not obligated to buy, and a willing seller, not obligated to sell, in a free and open market. *Johnson v. Jernigan,* 1970 OK 180, ¶ 5, 475 P.2d 396, 398. The term market value has been construed as synonymous with actual value. *Katschor v. Eason Oil Co.,* 1936 OK 705, ¶ 0, 63 P.2d 977 (syllabus 3 by the court).

¶ 18 There are three basic methods of establishing the market value at the well-head. The first and most preferred is an actual sale reached through arm's-length negotiations. *Tara ·Petroleum Corp. v. Hughey,* 1981 OK 65, 630 P.2d 1269. The rule adopted in *Tara* is: "[If a] producer enters into an arm's-length, good faith gas purchase contract with the best price and terms available to the producer at the time, that price is the 'market price' and .will discharge the producer's gas royalty obligation." *Id.* at ¶ 14, 630 P.2d at 1273. Such a sale establishes the market value. *Id.* In this case, there was not an actual arm's-length sale at the wellhead.

¶ 19 If the market value at the wellhead is not established by an actual arm's-length sale at the best price available, then the market value may be constructed by evidence of the prevailing market price. *Cimarron Utils. Co. v. Safranko,* 1940 OK 181, ¶ 0, 101 P.2d 258, 259 (syllabus 1 by the. court). Arm's-length wellhead sales or offers of purchase from the same well and close in time to the sale at issue are proof of the prevailing market price. Proof of arms'-length sales from other wells in the vicinity can also be used to establish the prevailing market price. *See Johnson,* 1970 OK 180 at ¶ 5, 475 P.2d at 398. The more similar in quality, quantity, delivery pressure, and geographical location of gas produced from other wells, the more probative and compelling are their sales in·determining the prevailing market price.

¶ 20 In addition to evidence of sales of like gas, the market value may be established by the work-back method. *Wood v. TXO Production Corp.,* 1992 OK 100 at n. 1, 854 P.2d at 882 n. 1; *Katschor,* 1936 OK 705, ¶¶ 0, 32, 63·P.2d 977, 981 (syllabus 4 by the court). Under the work-back method, the market value at the wellhead is calculated by subtracting allowable costs and expenses from the first downstream, arm's-length sale.. *Katschor,* 1936 OK 705 at ¶¶ 0, 32, 63 P.2d at 977, 981(syllabus 4 by the court). When the gas is marketable at the wellhead, the reasonable post-production costs may be charged against the royalty payments. *Mittelstaedt v. Santa Fe Minerals, Inc.,* 1998 OK 7, ¶ 2, 954 P.2d 1203, 1204. This is so because the referenced starting

point in the calculations is the value of the gas after processing and the royalty owners are entitled only to the value of the gas that is marketable at the wellhead. The burden is on the producer to justify the costs and expenses. *Id.* Because it is in the producer's best interest to maximize the costs and expenses, the courts must carefully scrutinize the figures to determine the correct amount. *See Tara,* 1981 OK 65 at ¶ 20, 630 P.2d at 1275.

¶ 21 In *Mittelstaedt,* the lease provided for royalty payments of "3/16 of the gross proceeds received for the gas sold." *Id.* at ¶ 1, 954 P.2d at 1204. The clause prohibits a producer from deducting the costs of obtaining a marketable product. *Id.* at ¶ 2, 954 P.2d at 1205. However, the costs incurred after the gas becomes marketable may be apportioned between the royalty owner and the producer. *Id.* at ¶ 2, 954 P.2d at 1205. In order to burden the royalty interest with a proportionate share of the costs, the producer must show: "(1) that the costs enhanced the value of an already marketable product, (2) that such costs are reasonable, and (3) that actual royalty revenues increased in proportion with the costs assessed against the nonworking interest." *Id.* at ¶ 2, 954 P.2d at 1205.

¶ 22 A royalty owner has a right to be paid on the best price available. *Johnson,* 1970 OK 180 at ¶ 14, 475 P.2d at 399; *see Tara* at ¶ 20, 630 P.2d at 1274. When the actual value is not obtainable because of a producer's self-dealing, the courts will carefully scrutinize the transactions on which the royalty payments are based. *Tara,* 1981 OK 65 at ¶ 15, 630 P.2d at 1274. Whenever a producer is paying royalty based on one price but it is selling the gas for a higher price, the royalty owners are entitled to have their payments calculated based on the higher price. *Id.* The plaintiffs here are entitled to have their royalty payments based on the prevailing market price or the work-back method, whichever one results in the higher market value. We hold that an intra-company gas sale cannot be the basis for calculating royalty payments. Because there remain unresolved questions of fact on whether the respondents underpaid royalties, partial summary judgment on this issue was improper.

¶ 23 The plaintiffs' also complain that they were not paid for the scrubber oil and drip condensates sold to third-parties after processing. Texaco posits that they are not required to pay royalties separately on the scrubber oil and drip condensate because they were taken into consideration when the third-party POP contracts were negotiated. Texaco continues that the scrubber oil and drip condensate are reflected in the percentages paid under the third-party POP contracts and in the plaintiffs' royalty payments. This is a matter of fact for the trial court to consider on remand. However, when using the work-back method, the court must consider their value in calculating the market value at the wellhead. *Katschor,* 1936 OK 705 at ¶ 29, 63 P.2d at 981.

B.   Fiduciary Duty

¶ 24 Relying on *Young v. West Edmond Hunton Lime Unit,* 1954 OK 195, 275 P.2d 304; *Leck v. Continental Oil Co.,* 1989 OK 173, 800 P.2d 224; *Goodall v. Trigg Drilling Co.,* 1997 OK 74, 944 P.2d 292; *Clements v. Oneok Resources, Inc.,* 1997 OK 118, ¶ 7, 946 P.2d 1154, 1156; *Roberts Ranch Co. v. Exxon Corp.,* 43 F. Supp.2d 1252, 1265 (W.D.Okla. 1997), the plaintiffs assert that Texaco had a fiduciary duty to the plaintiffs based on Texaco's status as a producer under the leases and the communitization agreements. Texaco argues that only when an area is subject to a unitization order issued by the Oklahoma Corporation Commission does a fiduciary relationship arise.

¶ 25 The communitization agreements, unlike unitization orders, are contracts just as the leases are contracts. In this case, the communization agreements do not impose any greater obligations on Texaco than do the leases. In short, the communization agreements do not create a fiduciary duty on Texaco's part. *See Finley v. Marathon Oil Co.,* 75 F.3d 1225, 1229–30 (7th Cir.1996).

¶ 26 In *Bunger v. Rogers,* 1941 OK 117, ¶ 5, 188 Okla. 620, 112 P.2d 361, 363, the plaintiff sought damages for underpayment

of royalty. This Court stated that the producer's "liability was purely a contractual one and in no sense fiduciary." In *Young*, 1954 OK 195, 275 P.2d 304, the royalty owners sued the unit managing committee after the area had been coercively unitized pursuant to section 286.1 (now section 287.1) of title 52 of the 1949 Oklahoma Statutes. *Id.* at ¶ 2, 275 P.2d at 306–07. After unitization, the leases no longer controlled. Unlike in *Young*, the communitization agreements here expressly provide for the leases to remain in force.

¶ 27 In *Leck*, 1989 OK 173 at ¶ 18, 800 P.2d at 229, this Court stressed that a fiduciary duty was not created solely by a lease but could arise from a unitization agreement and order. In *Goodall*, 1997 OK 74 at ¶ 11, 944 P.2d at 295, this Court refused to find an operator owed a fiduciary duty to an overriding royalty interest owner based solely on the lease. However, a breach of the duty to act diligently in determining and paying the royalty owners might toll the statute of limitations. *Id.*

¶ 28 The plaintiffs' have misconstrued these cases. This court has not held that a royalty lease alone creates a fiduciary relationship. To the extent that other courts have so held when applying Oklahoma law, they have misread our decisions. *See Roberts Ranch Co.*, 43 F.Supp.2d at 1265. Texaco had no fiduciary duty to the plaintiffs based on the leases or the communitization agreement.

## C. Constructive and Actual Fraud

¶ 29 Constructive fraud is the concealment of a material fact by one who has a duty to disclose. *Varn v. Maloney*, 1973 OK 133, ¶ 17, 516 P.2d 1328, 1332. Constructive fraud may be based on either an equitable duty or legal duty. *Faulkenberry v. Kansas City Southern Ry. Co.*, 1979 OK 142, ¶ 4, 602 P.2d 203, 206. In *Faulkenberry*, this Court recognized a constructive fraud claim based on a legal duty under the Federal Employers' Liability Act. *Id.* at ¶ 5, 602 P.2d at 206.

¶ 30 In the present case, the Production Revenue Standards Act, *52 O.S.2001, 570.1-.15* (PRSA), provides a legal duty on which the plaintiffs can base a claim for constructive fraud. Section 570.10 provides: "All proceeds from the sale of production shall be regarded as separate and distinct from all other funds of any person receiving or holding the same until such time as such proceeds are paid to the owners legally entitled thereto." Section 570.12, previously section 540, requires information to be included for each property and month of sale with the payment from the sale of oil or gas. The required information includes: (1) the lease's or well's identification; (2) "[m]onth and year of sales included in the payment;" (3) "total barrels or MCF attributed to the payment;" (4) price per barrel or price per MCF; (5) the amount of severance and other production taxes, but not windfall profit taxes, attributed to the payment; (6) "[n]et value of total sales attributed to such payment after taxes are deducted;" (7) owner's interest in decimal form in production from the property; (8) "[o]wner's share of the value of sales attributed to the payment prior to any deductions;" (9) "[o]wner's share of sales value attributed to such payment less owner's share of production and severance taxes;" and (10) "[a] specific listing of the amount and purpose of any other deductions from the proceeds attributed to such payment due to the owner" upon the owner's request.

¶ 31 The PRSA provisions give the royalty owners a right to be accurately informed of the facts and place a legal duty on the respondents to accurately inform the plaintiffs of the facts on which the royalty payments are based. The respondents failed to include any statements or evidentiary materials in their motions for partial summary judgment showing that they complied with the PRSA.

¶ 32 In addition to the constructive fraud claim, the plaintiffs are seeking damages for actual fraud. Actual fraud is "a material false representation, made with knowledge of its falsity or recklessly without knowledge as to its truth or falsity, as a positive assertion, with the intention that it be acted upon by another." *Varn*, 1973 OK 133 at ¶ 17, 516 P.2d at 1332. To be actionable, both actual fraud and constructive fraud require detrimental reliance by the person complaining. *Id.*

¶ 33 The respondents, in the statement of facts in their motion for partial summary judgment state: "[H]owever, no Plaintiff relied to his or her detriment on any information contained in those check stubs." The respondents then reference the depositions of some, but not all, of the plaintiffs. Thus, the respondents have failed to support their statement of material facts as to which they contend that there is no genuine dispute by sufficient evidentiary materials as required by the rule on summary judgment. By failing to adequately support their statement of this fact, the respondents were not entitled to partial summary judgment on the issues of actual fraud and constructive fraud. *See* 12 O.S.2001, ch. 2, app. 1, rule 13.

## V. CONCLUSION

¶ 34 We hold that an intra-company gas sale cannot be a basis for calculating royalty payments. The trial court erred in granting Texaco's motion for summary judgment on the issue of underpayment of royalties. There exists a genuine issue of material fact as to the market value of plaintiffs' gas and whether Texaco underpaid the royalties. The trial court properly granted judgment in favor of Texaco on the issue of breach of fiduciary duty as to those wells which are not in an area subject to a unitization order. Because material facts remain in dispute, partial summary judgment on the issues of actual and constructive fraud was improper. We affirm in part and reverse in part.

**CERTIFIED INTERLOCUTORY ORDER AFFIRMED IN PART AND REVERSED IN PART; CAUSE REMANDED FOR FURTHER PROCEEDINGS.**

¶ 35 WATT, C.J., LAVENDER, HARGRAVE, WINCHESTER, EDMONDSON, TAYLOR, COLBERT, JJ., concur.

¶ 36 KAUGER, J., concurs in result.

¶ 37 OPALA, V.C.J., dissenting.

I would not have granted certiorari to review this certified interlocutory order.