No. 16-0136 – *Leggett et al v. EQT Production Co.*

WORKMAN, J., concurring:

I concur in the majority's conclusion that the use of the phrase "at the wellhead" in West Virginia Code § 22-6-8 must be construed in a manner which most closely effectuates the Legislature's intent at the time the statute was enacted, as required by our canons of statutory construction. I therefore agree that, for purposes of the statutory language, the term "at the wellhead" permits use of the "netback" method of royalty calculation. I write separately, however, to emphasize that the majority's decision to allow cost deduction may not be abused to the detriment of lessors who are chargeable with pro-rata costs and to urge the Legislature to enact specific protections to assure fairness and reasonableness in the calculation of post-production costs. As the majority's new syllabus point states, only such costs as are *reasonable* and *actually incurred* are properly deductible. Accordingly, to the extent that a lessor alleges that cost deductions are artificially inflated or are otherwise not commercially reasonable, he or she may clearly maintain an action against the lessee pending sufficient proof thereof.

The petitioners' allegations below are, unfortunately, not without precedent. *See EQT Prod. Co. v. Adair*, 764 F.3d 347, 365 (4th Cir. 2014) (alleging coalbed methane sold "at too low a price, in part, by selling the gas to affiliates in non-arms-length transactions" and defendant took "improper or excessive deductions"). Courts nationwide, whether following the marketable product rule or "at the well" rule,

1

have had occasion to address similar allegations of self-dealing or outright fraud in the deduction of costs and/or manipulation of sales price to the detriment of the lessor. *Anderson Living Trust v. Conocophillips Co., LLC*, No. CV 12-0039 JB/KBM, 2016 WL 1158341, at *11 (D.N.M. Mar. 1, 2016) (alleging defendant utilized intercompany transactions and/or contracts with affiliate companies to impose unreasonable expenses and deductions and/or for services not actually incurred); *Abraham v. BP Am. Prod. Co*., 685 F.3d 1196, 1201 (10th Cir. 2012) (alleging netback method included an unreasonable processing cost and gas sold at discounted price to affiliate company); *Ramming v. Nat. Gas Pipeline Co. of Am.*, 390 F.3d 366, 373 (5th Cir. 2004) (alleging lessee sold gas in "sham transaction" for purposes of affecting royalties). Nothing in the majority opinion alters a lessor's right to relief in the event such conduct is established, nor should lessees perceive the majority to be malleable with respect to a lessor's right to fair and equitable treatment in the payment of royalties. [1]

Understandably, however, the majority opinion may illicit criticism for placing what may be characterized as an unfair burden on a landowner-lessor to adduce sufficient evidence to, in good faith, file an action alleging royalty underpayment.

[1] A court examining the issue of the fairness and reasonableness of post-production costs should be wary of lessees' affiliate entities realizing a profit from post-production costs. As other courts have observed and as noted by the majority, "[c]ourts should take care not to allow lessors to be deprived or defrauded of their royalties by their lessees entering into illusory or collusive assignments or gas purchase contracts." *Tara Petroleum Corp. v. Hughey*, 630 P.2d 1269, 1275 (Okla. 1981).

Regrettably, that is the unavoidable consequence of the Court's decision. To alleviate such a burden other states have enacted legislation designed to compel the lessee to affirmatively provide information and be accountable to those with whom such costs will be shared. For example, Montana has enacted a statute which makes the following requirements for royalty payments:

> (1) An oil and gas producer paying royalties by check, draft, or order shall include with every payment a form showing the following matters relating to that payment:
>
>> (a) the name of the royalty owner to whom the payment is made;
>>
>> (b) the date of the check, draft, or order;
>>
>> (c) any royalty owner identification number used by the producer for the royalty owner;
>>
>> (d) the time period during which production occurred for which payment is being made;
>>
>> (e) any number used to identify the lease under which production occurred;
>>
>> (f) the type of product produced;
>>
>> (g) barrels of oil and cubic feet of gas for which payment is made;
>>
>> (h) the amount and type of all taxes withheld;
>>
>> (i) the net value of production;
>>
>> (j) the royalty owner's net value; and
>>
>> (k) contact information for obtaining additional information regarding the payment and answers to questions.

(2) In addition to the information required in subsection (1), an oil and gas producer paying royalties to a royalty owner shall, at the time of payment, specify by line item every charge assessed against the royalty owner.

(3) Any person purposely and knowingly violating the provisions of subsection (1) or (2) is guilty of a misdemeanor and upon conviction shall be punished by a fine of not more than $1,000.

Mont. Code Ann. § 82-10-104 (West).  Colorado has similar requirements:

Notwithstanding any other applicable terms or arrangements, every payment of proceeds derived from the sale of oil, gas, or associated products shall be accompanied by information that includes, at a minimum:

(a) A name, number, or combination of name and number that identifies the lease, property, unit, or well or wells for which payment is being made;

(b) The month and year during which the sale occurred for which payment is being made;

(c) The total quantity of product sold attributable to such payment, including the units of measurement for the sale of such product;

(d) The price received per unit of measurement, which shall be the price per barrel in the case of oil and the price per thousand cubic feet ("MCF") or per million British thermal units ("MMBTU") in the case of gas;

(e) The total amount of severance taxes and any other production taxes or levies applied to the sale;

(f) The payee's interest in the sale, expressed as a decimal and calculated to at least the sixth decimal place;

4

(g) The payee's share of the sale before any deductions or adjustments made by the payer or identified with the payment;

(h) The payee's share of the sale after any deductions or adjustments made by the payer or identified with the payment;

(i) An address and telephone number from which additional information may be obtained and questions answered.

(2.5) Upon written request by the payee, submitted to the payer by certified mail, the payer shall provide to the payee within sixty days a written explanation of those deductions or adjustments over which the payer has control and for which the payer has information, whether or not identified with the payment, and, if requested by the payee, such meter calibration testing and production reporting records that are required to be maintained by the payer in accordance with section 34-60-106(1)(e). The requirement to provide a written explanation of deductions or adjustments shall not preclude the payer from answering the inquiry by referring the payee to the royalty clause or payment provision in a lease or other agreement.

(2.7) A payer who fails to provide information required or requested in accordance with subsection (2.3) or (2.5) of this section shall be subject to penalties as provided in section 34-60-121.

Colo. Rev. Stat. Ann. § 34-60-118.5 (West). Such statutory requirements create an avenue through which a lessor may obtain information upon which further inquiry may be based and acknowledges the shared accountability and good faith required where post-production costs are realized by both lessor and lessee.

What both the foregoing and the majority's opinion underscores is the necessity of the Legislature to address these policy-laden issues and declare, by statute,

5

the will of the State's citizenry in this regard. This Court is constrained to our canons of statutory construction and does not make policy. "This Court does not sit as a superlegislature, commissioned to pass upon the political, social, economic or scientific merits of statutes pertaining to proper subjects of legislation. It is the duty of the Legislature to consider facts, establish policy, and embody that policy in legislation. It is the duty of this Court to enforce legislation unless it runs afoul of the State or Federal Constitutions." Syl. Pt. 2, *Huffman v. Goals Coal Co.*, 223 W. Va. 724, 725, 679 S.E.2d 323, 324 (2009). Where the Legislature's inaction in the face of such significant changes in the industry leaves this Court to intuit its intentions and/or retrofit outdated statutory language to evolving factual scenarios, the will of the people is improperly disregarded.

Accordingly, I respectfully concur.