OSCN Found Document:HITCH ENTERPRISES v. KEY PRODUCTION COMPANY

 

 
 

 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only

 
 
 

 
 HITCH ENTERPRISES v. KEY PRODUCTION COMPANY
2023 OK CIV APP 42
Case Number: 119052
Decided: 12/30/2022
Mandate Issued: 11/16/2023
DIVISION IV
THE COURT OF CIVIL APPEALS OF THE STATE OF OKLAHOMA, DIVISION IV

Cite as: 2023 OK CIV APP 42, __ P.3d __

 

HITCH ENTERPRISES, INC., on behalf of itself and others similarly situated, Plaintiff/Appellee,
v.
KEY PRODUCTION COMPANY, INC., Defendant/Appellant.

APPEAL FROM THE DISTRICT COURT OF
TEXAS COUNTY, OKLAHOMA

HONORABLE RYAN D. REDDICK, TRIAL JUDGE

AFFIRMED

Rex A. Sharp, Barbara C. Frankland, SHARP LAW, LLP, Prairie Village, Kansas, and
Nathan K. Davis, Pro Hac Vice, SNELL & WILMER, L.L.P., Denver, Colorado, for Plaintiff/Appellee
and
Bradley W. Welsh, GABLE & GOTWALS, Tulsa, Oklahoma, for Defendant/Appellant

JOHN F. FISCHER, CHIEF JUDGE:

¶1 Key Production Company, Inc., appeals the district court's order certifying Hitch Enterprises, Inc.'s case as a class action in this natural gas royalty dispute. Hitch filed this case on behalf of itself and all similarly situated royalty owners alleging that Key had breached the implied covenant to market natural gas extracted from wells in which Class members own a royalty interest. Hitch alleges that Key wrongfully deducted certain processing costs from the proceeds Key received for selling the gas before paying the royalty owners their proportionate share of the sale proceeds. After class discovery and a hearing on Hitch's motion to certify the case as a class action, the district court found that Hitch had satisfied the statutory elements required by 12 O.S.2021 § 2023 and granted Hitch's motion. We affirm.

BACKGROUND

¶2 This case involves 386 wells located in fourteen different counties and producing from seventeen different reservoirs. The wells are located on property subject to 3,032 oil and gas leases in which Key is the lessee. More than 3,000 royalty owners, the members of the Class certified by the district court, are the lessors. Key is the operator of these wells or responsible for marketing and selling any gas extracted from the Class wells. Key sells the gas from these wells pursuant to twenty-two gas purchase contracts. Key is also responsible for paying the royalty owners their proportionate share of the sale proceeds.

¶3 Generally, a lessee, like Key, will engage in one or more of the following services necessary to transform gas produced at the well into a marketable product: gathering (G), compressing (C), dehydration (D), treatment (T), and processing (P). The industry and relevant jurisprudence commonly refer to these services as GCDTP services. However, some gas is marketable without the necessity of any of these services.

¶4 The "sole issue" in this case, as described by Key, is the proper allocation of the "expenses of extracting natural gas liquids ("NGLs") at processing plants to yield residue gas (mostly methane) and NGLs (such as ethane, propane, butane, and heavier liquid hydrocarbons)." Key charged Class members their proportionate share of these expenses. These expenses are the "processing costs" at issue in this case and which the Class members seek to recover.

¶5 Despite its 36 assignments of error, the essence of Key's appeal centers on two contentions: (1) whether processing is necessary to produce marketable gas requires a fact-intensive inquiry dependent on the quality and attributes of the gas extracted from each of the 386 Class wells; and (2) the amount Key is required to pay Class members for marketable gas depends on the terms of each of the 3,032 individual leases, over eighty different royalty clauses and twenty-two gas purchase contracts. Key argues that these issues cannot be resolved with common evidence and, therefore, individualized issues predominate. Key contends that this case is not appropriate for class treatment and the district court erred in granting Hitch's motion and certifying this Class of plaintiffs.

STANDARD OF REVIEW

¶6 The de novo standard of review controls our review of the district court's class certification order. Marshall Cnty. v. Homesales, Inc., 2014 OK 88, ¶ 6, 339 P.3d 878 (interpreting 12 O.S. Supp. 2013 § 2023(C)(2)). The legal conclusion that a class should or should not be certified is reviewed independently and without deference to the district court's ruling. Id. Although the same legal standard governs the decision to grant or deny class certification, the district court and the appellate court do not perform the same function. When necessary, the district court engages in "preliminary" fact-finding to resolve the certification issue. The appellate court reviews those findings pursuant to the "against-the-clear-weight-of-the-evidence" standard. Id. ¶ 7.

¶7 Nonetheless, the district court's factual determinations are only a "forecast" of the evidence that may eventually be produced at trial and not a decision on the merits of the claim. Burgess v. Farmers Ins. Co., Inc., 2006 OK 66, ¶ 15, 151 P.3d 92. (Burgess recognized "the rule that it is inappropriate to consider the merits of a claim" or any indication of how a jury might decide the fact questions. Id. ¶ 16. Ultimately, a class certification order "resolves only a question of law and the de novo standard required by Title 12 O.S. Supp. 2013 2023(C)(2) is appropriate for appellate review of class certification orders entered after November 1, 2009." Marshall Cnty., 2014 OK 88, ¶ 8.

ANALYSIS

¶8 As noted, this case concerns the processing costs of removing natural gas liquids in conjunction with the production and sale of the gas produced by Key from the Class wells. Processing involves lowering the temperature of raw gas to remove certain liquids before the gas will be accepted into an intrastate or interstate purchaser's high-pressure transmission pipeline for ultimate sale to consumers. Key has contracted with several "midstream" companies to perform the processing required by the transmission companies for the gas extracted from the Class wells. None of these midstream companies is owned by or affiliated with Key.

¶9 The gas from each of the individual Class wells is collected through gathering systems attached to the wells and commingled with gas from other Class wells for delivery to the midstream companies' plants. After the midstream companies complete the necessary processing, the gas received from Key is delivered to the transmission pipeline companies. In general, the midstream companies pay Key the price they receive from the transmission companies after deducting the costs of processing. That net amount is the amount Key used to calculate a Class member's proportionate share of the sale price of the gas extracted from the Class member's well.

¶10 Whether Key can charge processing costs to Class members usually depends on whether the costs are necessary to transform the gas into a marketable product.

Generally, costs have been construed as either production costs which are never allocated, or post-production costs, which may or may not be allocated, based upon the nature of the cost as it relates to the duties of the lessee created by the express language of the lease, the implied covenants, and custom and usage in the industry.

Mittelstaedt v. Santa Fe Minerals, Inc., 1998 OK 7, ¶ 26, 954 P.2d 1203. Post-production costs are not an issue in this case. Hitch contends that the midstream companies' processing fees which Key charged Class members were non-chargeable production costs and has limited its claim for damages to that contention.

I. Key's Contractual Obligation

¶11 "It is common knowledge that raw or unprocessed gas usually undergoes certain field processes necessary to create a marketable product. These field activities may include, but are not limited to, separation, dehydration, compression, and treatment to remove impurities." Id. ¶ 21. In Oklahoma, a lessee in Key's position is subject to a covenant implied in its lease by law to provide, at the lessee's expense, any of the field services necessary to transform gas extracted from the well into a marketable product. '"[T]he implied duty to market means a duty to get the product to the place of sale in marketable form.'" Id. ¶ 12 (quoting TXO Prod. Corp. v. State ex rel. Comm'rs of Land Office, 1994 OK 131, ¶ 11, 903 P.2d 259). What is required to transform gas extracted from the Class wells into a marketable product is a central issue in this case.

¶12 Oklahoma case law has established that "the costs for compression, dehydration and gathering are not chargeable to [royalty owners] because such processes are necessary to make the product marketable under the implied covenant to market." TXO Prod. Corp., 1994 OK 131, ¶ 17; see also Mittelstaedt, 1998 OK 7, ¶¶ 24-29. Transportation costs may or may not be chargeable to royalty owners depending on whether there is a market for the gas "available at the lease." Id. ¶ 13 (explaining and discussing Johnson v. Jernigan, 1970 OK 180, 475 P.2d 396).

¶13 Key has not charged Class members for compression, dehydration, gathering or transportation costs. Post-production "excess" services used to enhance marketable gas are not at issue in this case. Id. ¶ 26. The "sole issue" is whether the midstream companies' processing fees for removing natural gas liquids from the gas extracted from the Class wells are production costs necessary to make a marketable product.

¶14 Although the Oklahoma Supreme Court has not specifically addressed whether processing costs are production costs with respect to the marketability issue, the legal analysis necessary to determine that question has been settled. See Id. ¶ 27 (explaining that the analysis for costs not previously identified as production costs, in that case, "blending" costs, "is the same as for dehydration costs"). Any "field processes necessary to create a marketable product" are not chargeable to the royalty owners. Id. ¶¶ 20-21. "[C]ustom and usage in the industry" may inform the scope of a lessee's duty. Id. ¶ 20. However, the evidence in this record shows that such factors, if any, did not limit Key's duty to provide a marketable product at its expense.[1] If the midstream processing costs at issue in this case were necessary to produce a marketable product, they are not chargeable to Class members.

II. The Class

¶15 Title 12 O.S. Supp. 2013 § 2023(A) provides that: "One or more members of a class may sue . . . on behalf of all only if:" (1) members of the class are so numerous that joinder of all is impracticable (numerosity), (2) questions of law or fact are common to the class (commonality), (3) the claims or defenses of the class representative are typical of those of the class members (typicality), and (4) the class representatives will fairly and adequately protect the interests of class members (adequacy). If the prerequisites of paragraph A are satisfied, class certification is authorized when the movant's petition "contains factual allegations sufficient to demonstrate a plausible claim for relief," and one of the three provisions of section 2023(B) applies. Key does not argue that numerosity is lacking for this Class. Key's appeal is focused on the commonality, predominance and superiority requirements of section 2023. 12 O.S. Supp. 2013 § 2023(B)(1) through (B)(3).

¶16 Hitch's class certification motion asserts that Key violated the implied covenant to market by charging Class members processing costs necessary to make the gas produced from the Class wells into a marketable product. Although this covenant is an implied term of every lease, the actual terms of a lease may alter the lessee's duty and provide for a different allocation. For example, a lessor may agree to share in some or all of the production costs, including processing costs. See TXO Prod. Corp. v. State ex rel. Comm'rs of the Land Office, 1994 OK 131, ¶ 11, 903 P.2d 259 (citing and quoting Wood v. TXO Prod. Corp., 1992 OK 100, ¶ 11, 854 P.2d 880, for the proposition that royalty owners cannot be charged compression costs to make gas marketable unless "'spelled-out in the oil and gas lease'").

¶17 In this case, Hitch has attempted to exclude from the Class any of Key's lessors who agreed to share in processing costs. The district court found that in 82 of the 3,121 leases produced by Key, the lessor had agreed to share in the production costs and excluded those leases from the Class. Hitch has included 175 lessors whose leases expressly prohibited Key from charging production costs. Hitch provided an exhibit summarizing the royalty clause language of the remaining 2,857 leases Key produced. The exhibit purports to show that these leases followed one of three methods for defining the amount of royalty to be paid, and that the Oklahoma Supreme Court had previously held that each of those three methods was subject to the implied covenant to market or were otherwise subject to that covenant. Although Key takes issue with Hitch's interpretation of the language in some of the leases, Hitch alleged that all of the leases of all Class members are subject to the implied covenant to provide gas for sale in a marketable form at Key's expense.[2]

¶18 The record demonstrates that the district court conducted a "rigorous analysis" of the exhibits and expert reports submitted by the parties in support of and in opposition to Hitch's motion and considered the arguments of counsel presented at the hearing on Hitch's motion.[3] Marshall Cnty. v. Homesales, Inc., 2014 OK 88, ¶ 8, 339 P.3d 878 (citing General Tel. Co. of Southwest v. Falcon, 457 U.S. 147, 160-61, 102 S. Ct. 2364 (1982)).[4] Following that hearing, the district court certified the following Class:

All royalty owners in Oklahoma wells operated or leased by Key Production Company, Inc. that have produced gas or gas constituents (such as residue gas, natural gas liquids, or helium) from January 1, 2013 to present.[5]

The district court found that Hitch had satisfied all four elements of section 2023(A) and certified this Class pursuant to section 2023(B)(3): "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods . . . ."

III. The Class Certification Order

¶19 The "factual allegations" contained in Hitch's petition are the starting point for appellate review of this class certification order. 12 O.S.2021 § 2023(B). As previously discussed, Hitch alleges that Key breached the implied covenant to market gas extracted from the Class wells by charging the Class members a portion of the processing fees Key incurred to produce a marketable product. Hitch alleges that this breach of contract resulted from a common course of conduct affecting all members of the Class, and that damages can be calculated using a formula based on the processing fees actually charged to Key by the midstream companies.

¶20 As a matter of contract law, Key's potential liability for this alleged breach can be resolved '"in one stroke.'" Marshall Cnty. v. Homesales, Inc., 2014 OK 88, ¶ 13, 339 P.3d 878 (quoting Wal-Mart Stores, Inc., v. Dukes, 564 U.S. 338, 349, 131 S. Ct. 2541, 2551 (2011)). That is, Key did or did not breach its leases with Class royalty owners by charging them for midstream processing costs. If Key did breach these leases, the Class members "have suffered the same injury," and Hitch's "claims will share common questions of law or fact . . . typical of the class claims." General Tel. Co. of Southwest v. Falcon, 457 U.S. at 157. The alleged breach of the Class leases is the "core liability" issue that Hitch will have to prove in order to prevail in this case. Scoufos v. State Farm Fire & Cas. Co., 2001 OK 113, ¶ 1, 41 P.3d 366.

¶21 As the district court found, the allegations supporting Hitch's request for class certification satisfy the requirements of section 2023. However, the class action statute '"does not set forth a mere pleading standard.'" Marshall Cnty., 2014 OK 88, ¶ 14 (quoting Wal-Mart, 564 U.S. at 350). "A party seeking class certification . . . must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." Wal-Mart, 564 U.S. at 350 (emphasis in original). The party opposing a class certification motion may rely on evidentiary materials to test the movant's allegations. And, "when challenged, as in this case, [Hitch] must provide evidentiary support for those allegations." Marshall Cnty., 2014 OK 88, ¶ 14.

¶22 Key challenges whether Hitch has satisfied the commonality, typicality and predominance requirements of section 2023, principally based on its contention that marketability is an individual issue. "The commonality and typicality requirements of Rule 23(a) tend to merge," as they do in this case. General Tel. Co. of Southwest v. Falcon, 457 U.S. 147, 157, 102 S. Ct. 2364 (1982). And, although the commonality and predominance analyses are related, "the predominance criterion is far more demanding." Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 624, 117 S. Ct. 2231, 2250 (1997). We focus on the predominance requirement because most of the statutory issues which Key has raised are "subsumed under" the predominance analysis. In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liability Litigation, 55 F.3d 768, 627 (3rd Cir. 1995), cert. denied, 516 U.S. 824, 116 S. Ct. 88 (1995). Nonetheless, as long as at least one common issue predominates, section 2023(B)(3) authorizes certification "'even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.'" Tyson Foods, Inc., v. Bouaphakeo, 577 U.S. 442, 453, 131 S. Ct. 1036, 1045 (2016) (quoting 7AA C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 778, p.p. 123-24 (3d ed. 2005)).

IV. The Predominance Requirement

¶23 Hitch contends that the predominance of three issues justifies class certification: (1) whether the Class leases are subject to the implied covenant to market; (2) if so, whether Key breached the leases by charging processing costs; and (3) if so, what are the Class members' damages. The underlying issues have been litigated for more than thirty years and, despite some courts' view to the contrary, the foundational law is fairly well-settled by the Mittlestaedt trilogy.[6] A lessor grants a producer like Key the right to develop the lessor's minerals, in this case, natural gas, in exchange for the lessee's agreement to undertake the risk of producing the gas and the cost of preparing the gas for sale, at the lessee's expense. Wood v. TXO Prod. Corp., 1992 OK 100, ¶ 11, 854 P.2d 880. Key cannot charge Class members for the costs incurred in transforming gas extracted from the Class wells into a marketable product. Mittelstaedt v. Santa Fe Minerals, Inc., 1998 OK 7, ¶ 26, 954 P.2d 1203 (stating that "production costs . . . are never allocated" to royalty owners).

¶24 When gas becomes marketable is often an issue in royalty dispute cases, and generally depends on the facts in a particular case. However, the essence of the lessor/lessee contract is the expectation of the revenue received from the sale of the gas produced. "The lessee is obligated to develop the commodity he has found so that it will bring the highest possible market value." Johnson v. Jernigan, 1970 OK 180, ¶ 14, 475 P.2d 396. "Once a producing well is drilled, a producer has a duty to market the gas. In order to market gas it is usually necessary to enter into a gas purchase contract . . . ." Tara Petroleum Corp. v. Hughey, 1981 OK 65, ¶ 13, 630 P.2d 1269 (footnote omitted). "Gas is 'sold' when it enters the purchaser's line." Wood v. TXO Prod. Corp., 1992 OK 100, ¶ 6. See Mittelstaedt, 1998 OK 7, ¶ 24 (because gathering occurs prior to gas being placed into the purchaser's pipeline, it is not an expense shared by royalty owners).

¶25 Consequently, we agree with this Court's legal conclusion in Pummill v. Hancock Exploration LLC, 2018 OK CIV APP 48, 419 P.3d 1268 (cert. denied May 21, 2018). To determine when gas becomes marketable, we determine when "the first, actual sale of gas" occurs. Id. ¶ 38 (emphasis in original) (affirming the trial court's finding as supported by competent evidence in a declaratory judgment proceeding).[7] See also Tara Petroleum Corp. v. Hughey, 1981 OK 65, ¶ 14, 630 P.2d 1269 (citation omitted)(stating that "an arm's-length, good faith gas purchase contract [at] the best price and terms available to the producer at the time . . . will discharge the producer's gas royalty obligation"); Howell v. Texaco, 2004 OK 92, ¶ 22, 112 P.3d 1154 (holding that an "intra-company gas sale cannot be the basis for calculating royalty payments").

¶26 In focusing on the first actual, arms-length sale, we do not foreclose the opportunity of a producer to show that the "first sale" included the price of the marketable gas and an additional value created by post-production costs properly allocable to the royalty owners. See Mittelstaedt, 1998 OK 7, ¶ 26. But Hitch contends that all of the gas extracted from the Class wells was not marketable and, therefore, not capable of being sold until after the processing by the midstream companies had been completed. In doing so, Hitch contends that no "excess" processing occurred and none of the processing that did occur enhanced the value of already marketable gas. Id.

¶27 Our Court has recognized that determining when marketable gas is first sold may involve complex, fact-intensive inquiries in some cases. See, e.g., Whisenant v. Strat Land Expl. Co., 2018 OK CIV APP 65, ¶ 12, 429 P.3d 703 (cert. denied Oct. 1, 2018). In other cases, the marketability issue may be resolved by the "characteristics" of the market into which the lessee chose to participate "rendering individualized gas-quality assessment unnecessary." Naylor Farms, Inc. v. Chaparral Energy, LLC, 923 F.3d 779, 795 (10th Cir. 2019) (discussing the holding in Pummill v. Hancock Expl. LLC, 2018 OK CIV APP 48, 419 P.3d 1268). Whether the marketability issue is "capable of classwide resolution" is critical in determining the class certification issue in this case. Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 349, 131 S. Ct. 2541, 2551 (2011) (finding that the absence of common questions of law or fact necessary to satisfy the commonality requirement of Federal Rule of Civil Procedure 23(a)(2) precluded class certification).

¶28 In Whisenant, this Court reversed an order certifying a class of royalty owners, finding that "the moment in time when oil or gas extracted from any particular well becomes a 'marketable product' and, thus, reaches its royalty-valuation point, requires a fact-intensive inquiry" too well-specific for common resolution. Whisenant v. Strat Land Expl. Co., 2018 OK CIV APP 65, ¶ 12, 429 P.3d 703. "We disagree that determinations of the quality of gas and other facts pertinent to each well are susceptible to generalized proof." Id. ¶ 17. As explained in the concurring opinion: "Historically, in order to establish the quality and quantity content of the gas hydrocarbons and contaminants produced at the wellhead, the standard practice has been to measure the pressure, volumetric flow, the crude gas content, energy content, and hydrocarbon content." Id. ¶ 3 (Rapp, J., concurring specially). However, "[t]he volume of gas as severed at the wellhead is not generally used by the producers to determine the royalty because of the unknown and precise nature of the gas pressure, hydrocarbon content, quality, and contaminants." Id. ¶ 4 (Rapp, J., concurring specially).

¶29 The facts in Whisenant are significantly different. The plaintiff in Whisenant sought to certify a class of almost ninety wells operated by Strat Land. All of the gas produced from each of these wells was sold to one midstream company based on volume, BTU content and other characteristics of the gas measured at the midstream company's wellhead meter located at each well before the gas was commingled with gas from other wells. Strat Land performed various activities on the leased premises without charge to the royalty owners in order to meet the midstream company's requirements for accepting the gas into its pipeline at its wellhead meter. Strat Land was paid based on "the measurements and analysis done on the gas produced from each individual well at the wellhead" according to a predetermined index which established the value of that quality of gas, and regardless of whether the midstream company was able to resell the gas to another purchaser. (See Appellant's Brief in Chief at 11-14, Whisenant v. Strat Land Expl. Co., Case No. 115,660).

¶30 In this case, Hitch contends that the predominance issue is determined by the way that Key actually treated the gas extracted from Class wells -- that is by commingling gas from several wells before necessary processing to make a marketable product -- rather than by evidence concerning the difference between the gas quality of individual Class wells. Consequently, this case lacks the individualized, well-by-well gas quality evidence and issues critical to the holding in Whisenant, and the analysis in that case does not advance the resolution of the predominance issue in this case.

¶31 In addition, Strack v. Continental Resources, Inc., 2017 OK CIV APP 53, ¶ 32, 405 P.3d 131 (cert. denied Oct. 2, 2017), relied on by Key, was decided on the basis of a motion to certify a class pursuant to section 2023(B)(1), the possibility of incompatible or prejudicial individual judgments; 2023(B)(2), injunctive or declaratory relief; and 2023(C)(6), certification of forty-eight legal issues relating to the (B)(1) and (2) allegations. The plaintiffs in Strack claimed that Continental underpaid their royalty interests in violation of section 570.12 of the Oklahoma Production Revenue Standards Act, 52 O.S.2021 §§ 570.1 through 570.12, and sought an accounting. The Court held that the availability of the legal relief authorized by the Act defeated equitable claims on which the class certification motion was predicated. Further, the class certification motion was decided based on the allegations in the plaintiffs' petition without an evidentiary hearing. After discussing the implied covenant to market and the Mittelstaedt decision, the Strack Court found that the conduct alleged by the plaintiffs as the basis for their accounting claim would require "highly individualized and fact-intensive review of each Class Members' claim . . . '[because] the merits of the claim turn on the defendant's individual dealings with each plaintiff.'" Strack, 2017 OK CIV APP 53, ¶ 32 (quoting Harvell v. Goodyear Tire & Rubber Co., 2006 OK 24, ¶ 27, 164 P.3d 1028). Consequently, the plaintiffs' petition failed to allege conduct by the defendant that would "settle 'the legality of the behavior with respect to the class as a whole . . . .'" Id. (quoting Marshall Cnty. v. Homesales, Inc., 2014 OK 88, ¶ 13, 339 P.3d 878).

¶32 In contrast, we deal with allegations of a class-wide breach of the implied covenant to market supported by evidence requiring an analysis to determine whether the weight of that evidence supports the district court's findings of fact. More importantly, the Strack Court's analysis did not address the predominance requirement of section 2023(B)(3) at issue in this case. As noted in the Special Concurring Opinion, the Majority in Strack did "not foreclose consideration of forming a class utilizing the provisions of 12 O.S. [2021] § 2023(B)(3)." Strack, 2017 OK CIV APP 53(Rapp, J., concurring specially).

¶33 More recently, in Naylor Farms, the United States Court of Appeals for the Tenth Circuit applied Oklahoma law in affirming the certification of a class of royalty owners pursuant to Rule 23 of the Federal Rules of Civil Procedure. Naylor Farms, Inc. v. Chaparral Energy, LLC, 923 F.3d 779 (10th Cir. 2019). Following a "highly deferential" standard for reviewing the district court's findings of fact, the Tenth Circuit concluded that the district court did not abuse its discretion in concluding that the marketability issue in that case involved not only common, but predominate issues, satisfying the requirements of Rule 23(a)(2) and (b)(3). Id. at 795.

¶34 The standard of review we follow is not "highly deferential" to the district court's fact-finding. Oklahoma's class action statute specifies a non-deferential de novo review. 12 O.S.2021 § 2023(C)(2). When the district court is required to engage in preliminary fact-finding to resolve a class certification order, the appellate court "examines the record, weighs the evidence and accepts the trial court's findings of fact unless they are against the clear weight of the evidence." Marshall Cnty., 2014 OK 88, ¶ 7.

¶35 Citing Marshall County, 2014 OK 88, ¶ 8, Hitch argues that it need only meet a prima facie burden to obtain certification of the class. Hitch misreads that case. "A prima facie showing is evidence that establishes a given fact necessary to a judgment, but which may be refuted by other evidence." State ex rel. Pruitt v. Native Wholesale Supply, 2014 OK 49, n.6, 338 P.3d 613. See Sides v. John Cordes, Inc., 1999 OK 36, ¶ 14, 981 P.2d 301 ("A prima facie case is made out by that quantum of proof which, if unexplained or uncontradicted, is sufficient to establish a given fact and to uphold a judgment in favor of the issue which it supports, but which may be refuted by other evidence."). Here, we deal with Hitch's evidence which has been refuted and the task of the appellate court is to weigh all of that evidence and accept the trial court's findings of fact unless the movant has failed to establish those facts by the clear weight of the evidence. Marshall Cnty., 2014 OK 88, ¶ 7.

¶36 Nonetheless, the difference between the Oklahoma and federal appellate standard of review does not diminish, in our view, the persuasiveness of the Naylor Court's legal reasoning or its understanding and application of Oklahoma law. After discussing the different approaches to the marketability issue in Whisenant and Pummill, the Naylor Court predicted that the Oklahoma Supreme Court would hold that marketability could be determined "based solely on expert testimony that all the gas at issue was required to undergo at least one GCDTP service before it could 'reach' and be 'sold into' the pipeline market." Naylor, 923 F.3d at 795. We agree. The Oklahoma Supreme Court has established the legal framework necessary to determine the marketability issue in the Mittlestaedt trilogy. The facts and the type of evidence used to prove when gas becomes marketable may vary from case to case, subject to the Oklahoma Evidence Code, 12 O.S.2021 §§ 2101 through 3011. As demonstrated from previous cases, expert testimony can be relevant to the marketability issue, and, if so, it is admissible. Hitch relies on such evidence in this case.

IV. Hitch's Class Evidence

¶37 Hitch contends that individualized factual inquiries are not required to determine marketability, not because the quality of the gas from each of the Class wells is the same or because a particular market determines the marketability issue. Hitch alleged and supported its allegations with evidence that Key's actual practice of commingling gas from individual Class wells before subjecting the commingled gas to the same processing not only makes it impossible for Class members to present individual evidence regarding the processing performed on gas from any individual well, but also that practice makes the breach of contract issue "susceptible to generalized class-wide proof." Tyson Foods, Inc. v. Bouaphakeo, 577 U.S. 442, 453, 131 S. Ct. 1036, 1045 (2016) (quoting 2 W. Rubenstein, Newberg on Class Actions § 4:50, 196-97 (5th ed. 2012)).

¶38 Tyson Foods was decided after Wal-Mart and Marshall County. Neither Wal-Mart nor Marshall County reached the class action statute's "(b)(3)'s predominance prong . . . ." Tyson Foods, 577 U.S. at 457. Wal-Mart v. Dukes, 564 U.S. 338, 131 S. Ct. 2541 (2011), was decided on the basis of federal Rule 23(a)(2)'s commonality requirement. Marshall County v. Homesales, Inc., 2014 OK 88, 339 P.3d 878, held that section 2023(B)(3) relief was not available to the plaintiff because it did not have standing to pursue a claim for damages. Tyson Foods did reach the predominance issue.

The "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." This calls upon courts to give careful scrutiny to the relation between common and individual questions in a case. An individual question is one where "members of a proposed class will need to present evidence that varies from member to member," while a common question is one where "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof."

Tyson Foods, 577 U.S. at 453 (internal citation omitted).

¶39 According to Hitch's expert, all of the gas produced from the Class wells not only required, but also was subjected to, GCDTP in order for the gas to be transformed into a marketable product. Key has not charged Class members any costs incurred for the GCDTP services. At this stage of the proceedings, we can assume that Key concedes that it was prevented from doing so by the implied covenant to market.

¶40 Key has charged royalty owners for the costs of processing the gas produced from the Class wells. According to Hitch's expert, (1) none of the gas produced from any individual Class well was marketable until after this processing occurred, and (2) Key did not process the gas produced from any individual Class well and did not have equipment on any lease capable of performing the required processing. According to Hitch's expert, all of the processing in this case was done by the midstream companies after the gas from individual Class wells was commingled with gas from other Class wells.

¶41 Key did not challenge the qualifications of Hitch's expert, nor did Key challenge the reliability or admissibility of the expert's evidence. Key challenged the conclusions of Hitch's expert with evidence from its own expert and argument supported by other evidentiary materials. At that point, the district court was required to "resolve factual disputes raised by the parties to determine whether the movant has satisfied the statutory prerequisites for a class action, even if those disputes involve the merits of the plaintiff's claim." Marshall Cnty. v. Homesales, Inc., 2014 OK 88, ¶ 8, 339 P.3d 878 (citations omitted). See also General Tel. Co. of Southwest v. Falcon, 457 U.S. 147, 160, 102 S. Ct. 2364 (1982) ("[S]ometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question."). In class certification proceedings, the district court may only accept as true any uncontroverted pleading allegations and undenied arguments of counsel. Harvell v. Goodyear Tire & Rubber Co., 2006 OK 24, ¶ 10, 164 P.3d 1028.

¶42 Key contends that royalty owners of any gas extracted from the Class wells that was marketable "at the wellhead" could be charged the costs of processing. This is a generally correct, but limited statement of the law. Post-production, "excess" processing to an already marketable product can only be allocated to royalty owners "when such costs are reasonable, and when actual royalty revenues are increased in proportion to the costs assessed against the royalty interest." Mittelstaedt v. Santa Fe Minerals, Inc., 1998 OK 7, ¶ 26, 954 P.2d 1023. Hitch contends that Key cannot prove that any gas was marketable when it was extracted from a Class well. Hitch's expert argued that Key could not determine the marketability of any gas "at the wellhead," because it did not do so before gathering and commingling gas from several Class wells and only then did it subject the commingled gas to the same amount of processing. The district court's findings of fact followed the view of Hitch's expert.

¶43 Whether Hitch or Key will ultimately prevail on the merits of this issue is for the trier of fact. Marshall Cnty., 2014 OK 88, ¶ 8 ("district court's disposition of the class action issue does not ultimately determine any issues of fact").[8] At this stage of the proceedings, neither we nor the district court decides the merits of the parties' respective position on that issue. Masquat v. DaimlerChrysler Corp., 2008 OK 67, ¶ 10, 195 P.3d 48 ("In considering a motion to certify a class, the trial court is not to resolve the merits of the claims or defenses asserted."). The predominant legal issue alleged by Hitch is whether Key's practice of charging Class members for the costs of processing commingled gas constitutes a breach of the Class member's lease. The district court concluded that practice, if proved, would constitute a breach of the implied covenant to market. Key has failed to demonstrate that the district court erred, as a matter of law, in doing so. Instead, Key focuses its appeal on individual evidentiary issues that it argues defeat the predominance required for class certification.

VI. Key's Appeal

¶44 In the hearing before the district court, Key argued three reasons why the proposed Class should not be certified: (1) the amount of royalty Key owed depended on the language of 3,032 individual Class leases and could not be resolved with common evidence, (2) determining when gas became marketable required an individualized examination of the gas quality of each of the 386 Class wells, and (3) calculating the alleged damages raised individual rather than class-wide accounting issues. Key also argued that the members of the Class were not ascertainable because Key disputed whether all of the leases of Class members prohibited Key from charging processing fees.[9] We review the district court's preliminary findings of fact regarding these issues to determine if they are against the clear weight of the evidence. Marshall Cnty., 2014 OK 88, ¶ 7.

A. Key's Gas Marketability Argument

¶45 Key's evidence and argument emphasize that the quality and composition of the gas "at the wellhead" are different for each of the 386 Class wells and that the quality and composition of gas determine how much, if any, GCDTP must be done to convert the gas from a particular well into a marketable product. Hitch did not dispute this claim and we accept it as true. See Harvell v. Goodyear Tire & Rubber Co., 2006 OK 24, ¶ 10, 164 P.3d 1028. However, the question is whether that fact defeats Hitch's ability to show that the "common issues make some difference in the case." Marshall Cnty., 2014 OK 88, ¶ 16. Individual issues are present, "in droves," in every class action. Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350, 131 S. Ct. 2541, 2551. However, just as the common issues asserted by the movant must predominate over the individual issues, the individual issues asserted by the party opposing class certification must determine the "core liability issue" the movant seeks to certify for class treatment. See Scoufos v. State Farm Fire & Cas. Co., 2001 OK 113, ¶ 1, 41 P.3d 366. See also Tyson Foods, Inc. v. Bouaphakeo, 577 U.S. 442, 457, 136 S. Ct. 1036, 1047 (affirming certification and holding plaintiff's reliance on statistical study did not deprive defendant of ability to litigate individual defenses).

¶46 Hitch argues that, although the quality and composition of gas from each well might be different, that difference did not determine how much processing was done before the gas was delivered by the midstream companies to an intrastate or interstate high-pressure pipeline purchaser. Hitch's evidence was derived from documents Key produced and Hitch's expert's evaluation of those documents. Hitch showed that individual royalty owners did not have access to those documents, and those documents show processing related to any individual Class well, but only the processing actually done after the aggregated gas was commingled from several Class wells.

¶47 The weight of the evidence in this record shows that individualized gas-quality analysis at the wellhead is not necessary to resolve the marketability issue because Key gathered and commingled all of the gas produced from the Class wells, including gas it contends was marketable at the wellhead, before it was delivered to the midstream companies for processing. As a result, whatever processing the midstream companies did, they did the same processing on the commingled gas regardless of the unique characteristics of the gas extracted from any individual Class well. And, that processing was done before any gas was delivered to an intrastate or interstate transmission pipeline, where Hitch contends the first, actual sale of marketable gas occurred. Key argues that Hitch must show that no gas from any Class well was marketable before delivery to the processing plants. However, Key's alleged practice of commingling gas prior to processing makes proof that gas from any Class well was not marketable at the wellhead "an impossible hurdle." Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687, 66 S. Ct. 1187 (1946) (superseded by statute on other grounds). Cf., Howell v. Texaco, 2004 OK 92, ¶ 22, 112 P.3d 1154 (noting that when marketability "is not obtainable because of a producer's [conduct]," courts look to alternative methods of proof).

¶48 Further, even differences in Key's twenty-two gas purchase contracts do not inject individual issues dispositive of the class certification issue. As Hitch notes, a gas purchase contract between Key and a pipeline company cannot modify the terms of the lease between Key and Class members absent evidence not included in this record. Based on Key's practice of commingling gas from the Class wells before processing, the district court found that individual Class members did not have any "first-hand evidence" to prove their breach of lease claim. The district court also found that Key did not dispute this aspect of Hitch's evidence. Finally, the district court found that the marketability issue "can be answered via generalized, class wide proof and . . . as a result, the marketability question is a common question that predominates over any individual questions." Those findings are not against the clear weight of the evidence. But they are only preliminary findings. The district court did "not decide at this stage whether the gas in this case is a marketable product at the wellhead, as Key contends, or after the [processing] services are performed, as Hitch contends." Order Granting Class Certification, p. 16, ¶ 56. That issue remains to be resolved by the trier of fact.

B. Key's Royalty Clause Argument

¶49 Key also argues that the district court erred in certifying this Class because the different language of the Class leases defeats the commonality, predominance and superiority requirements of section 2023. According to Key, over 99% of the 3,032 leases have different language and eighty-eight different royalty clauses. Nonetheless, Key was able to classify the different royalty clauses of the Class leases as containing one of four provisions: (1) 1,982 leases base royalty payments on "actual proceeds," (2) 31 leases base royalty payments on the value of the "raw" gas or gas in its "natural state," (3) 595 leases base royalty payments on the value of the gas "at the well," and (4) 6 leases base royalty payments on the value of gas established by an "arms-length" transaction. Key concludes that Oklahoma law is "settled" on this point -- "commonality, predominance, and superiority cannot be satisfied if Key's leases do not prescribe a common payment obligation." We are not persuaded by Key's argument.

¶50 First, we agree with the United States District Court for the Western District of Oklahoma: "Language in the royalty clauses . . . does not have to be identical . . . ." for a class to be certified. Naylor Farms, Inc. v. Chaparral Energy, CIV-11-0634-HE, 2017 WL 18754, at * 4 (W.D. Okla. Jan. 17, 2017), affirmed by Naylor Farms, Inc. v. Chaparral Energy, LLC, 923 F.3d 779 (10th Cir. 2019). The differences Key points out in the language of these leases are only relevant to the extent they affect the allocation of processing costs and the allegations central to Hitch's breach of lease claim. That is, if all of the Class leases are subject to the implied covenant to market, and Key breached that covenant by charging Class members for processing costs, it does not matter what individualized language in an individual Class lease gave rise to the implied covenant to market.

¶51 Second, the three cases Key cites do not support this argument. We previously have distinguished Strack v. Continental Resources, Inc., 2017 OK CIV APP 53, 405 P.3d 131, in which this Court reversed a class certification order because individual terms of the various leases, not any differences in the royalty clauses of those leases, determined what accounting obligations the lessee owed to a lessor.

¶52 In Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc., 725 F.3d 1213 (10th Cir. 2013) (applying Kansas law), the federal court did not hold, as Key argues, that a common payment obligation was required to certify a class of royalty owners.[10] The court reversed a certification order because the plaintiff, unlike Hitch, had not undertaken the analysis of every lease to determine if it was subject to the implied covenant to market. Because the proposed class included leases that did not include the implied covenant, and leases that had not been examined to determine if they were subject to that covenant, the federal appellate court vacated the class certification order and remanded the case for further consideration. "On remand, the [plaintiff] could, for example, create a chart classifying lease types . . . and although we express no opinion as to the merits, the district court could decide that no lease type negates the [implied covenant]." Id. at 1219. That is precisely what Hitch has done in this case.

¶53 Panola Independent School District No. 4 v. Unit Petroleum Company, 2012 OK CIV APP 94, ¶ 10, 287 P.3d 1033 (cert. denied Oct. 8, 2012), principally involved unleased royalty owners who were "force-pooled" pursuant to a Corporation Commission order. This Court held that recent legislation specifically providing that unleased and force-pooled royalty owners were covered by the implied covenant to market did not apply retroactively. Following another decision by this Court, New Dominion, L.L.C. v. Parks Family Co., L.L.C., 2008 OK CIV APP 112, 216 P.3d 292, the Panola Court determined that "where the royalty interest was created not by a written lease but by a pooling order, no covenant to market arose." Panola, 2012 OK CIV APP 94, ¶ 13. With respect to those royalty owners, their rights were determined by the provisions of the Corporation Commission pooling order and, therefore, a class action was not the superior method to determine the propriety of the operator's deductions for costs related to the production of the royalty owner's natural gas. "Not only do the claims of these owners relating to post-production costs differ markedly from the rest of the class, they must be resolved by a different tribunal." Id. ¶ 17. To that extent, Panola has nothing to offer regarding resolution of the issues in this case.

¶54 With respect to the proposed class of royalty owners who acquired their interest pursuant to leases, the Panola Court held that a multiplicity of lease types required "a different inquiry in determining the royalty owner's claim for underpayment of royalties based on deduction of post-production costs." Id. ¶ 20. Without discussing the commonality, typicality or predominance of the class issues, the Panola Court held that the class representatives had failed to show that a class action was superior to other methods for resolving the alleged royalty underpayment issues. Again, Hitch's case does not concern an alleged improper "deduction of post-production costs." Further, because of the narrow class definition in this case and the facts supporting the alleged breach of the implied covenant to market, the differences in lease language do not defeat the superiority requirement of section 2023(B)(3) for the reasons previously discussed. As noted in the treatise cited by Key, when "royalty provisions vary as to type, a class action is not appropriate to recover deficiencies in payment of royalty." 3 Eugene Kuntz, A Treatise on the Law of Oil and Gas § 40.4(a) (1989). In the Class certified by the district court, the royalty provisions do not "vary as to type." All are alleged to be subject to the implied covenant to market.

¶55 Finally, during class discovery, Key produced copies of 3,121 leases which covered the Class wells. Hitch reviewed all of these leases and excluded 82 because they expressly provided that Key could charge the lessor the lessor's proportionate share of production costs, including the processing fees charged by the midstream companies. Hitch prepared an exhibit which summarized the remaining 3,032 leases. The exhibit identified each lease by the form Key used, quoted the relevant royalty clause and any addendum, and then characterized the lease as either expressly prohibiting Key from deducting any production costs or subject to the implied covenant to market. To conclude that leases were subject to the implied covenant, Hitch compared the royalty language in the Key leases with royalty language that the Oklahoma Supreme Court had previously determined in the Mittelstaedt trilogy was subject to the implied covenant. According to Hitch, 86% of the leases had the same or similar language to the leases at issue in the Mittelstaedt trilogy.

¶56 The district court reviewed Hitch's lease summary and found that Key had not provided any evidence questioning the general accuracy of Hitch's exhibit. The district court also confirmed that Hitch's exhibit "is generally accurate at least with respect to the lease language considered." Cf., Kunneman Props., LLC v. Marathon Oil Co., 2022 WL 1766925, at *14 (N.D. Okla. 2022)(declining to certify class "given the general inaccuracies in the Lease Charts"). From its review of the exhibit, the district court found that 175 of the 3,032 Class leases contained express language prohibiting Key from charging the lessor any production costs. The court found the remaining 2,857 leases were subject to the implied covenant to market because they were "silent" as to the allocation of processing costs performed by the midstream companies, or the specific language in the lease authorizing the allocation of some production costs did not permit the deduction of processing costs from the royalty owner's sale proceeds. In doing so, the district court preliminarily resolved a question of law by interpreting the language of the various leases.

¶57 This Court has also reviewed Hitch's lease summary, de novo. On remand, Key may challenge the inclusion of an individual lease by showing that Hitch's lease summary inaccurately described the lease. However, the district court did not err in its construction of the royalty language summarized in Hitch's exhibit. For purposes of this appeal, all of the Class leases prohibit Key from charging Class members their proportionate share of the processing fees Key paid to the midstream companies. That Class is ascertainable from Hitch's lease summary exhibit.

C. Key's Argument Concerning Damages

¶58 The predominance of the implied covenant to market and its alleged breach is sufficient to affirm the class certification order. See Tyson Foods, Inc. v. Bouaphakeo, 577 U.S. 442, 453, 136 S. Ct. 1036, 1045. Nonetheless, the district court also rejected Key's argument that individualized accounting issues would overwhelm the common questions raised by Hitch's motion. Key's expert opined that class-wide measurement of damages was impossible because the gas purchase contracts, pricing formulas, upstream versus downstream costs, and "the demonstrable diversity of the lease language for each of the owners will not 'reduce' to a singular, common class-wide mode." Hitch's expert used a model to calculate damages on a class-wide basis from documents produced by Key showing the amount Key deducted for processing costs. With interest, Hitch's expert calculated the Class damages as of the date of his report to be $2,523,475.71. The district court found Hitch's evidence to be "sufficient at this time to allow a finding of predominance."

¶59 Key contends that Hitch's expert's approach is "overly-simplistic" and dependent on the erroneous claim that gas is not marketable until it enters a transmission pipeline. According to Key, "the actual economic marketplace for natural gas . . . starts at the wellhead market." And, according to Key, the requirements of transmission pipelines are different, resulting in more or less GCDTP to deliver an acceptable product. Key points out that Oklahoma law allows it to charge Class members their proportionate share of post-production costs, including any reasonable processing costs that enhanced the value of already marketable gas before delivery to a transmission pipeline. But Hitch has not sought to recover for any post-production costs charged to Class members. Hitch claims that the processing costs charged to Class members were not post-production costs but costs necessary to produce a marketable product in the first place. As Hitch has framed the issue, it does not matter that transmission pipelines have different requirements if, as Hitch's expert opined, all of the gas extracted from Class wells had to undergo some processing to meet the least stringent transmission company requirements.

¶60 When gas extracted from Class wells became marketable is, perhaps, the ultimate merits issue in this case. And, Key may ultimately prevail at trial on that issue. But we do not decide the merits when reviewing a class certification order for the reasons previously stated. As Key argued to the district court at the Class certification hearing: "We don't need to decide today the merits of this marketability dispute . . . ." We decide whether the district court's finding that Hitch could prove damages based on class-wide proof of the processing fees Key charged Class members was against the clear weight of the evidence. It is not.

CONCLUSION

¶61 The common and predominant issue Class members seek to prosecute is whether their lessee, Key Production Company, Inc., can require them to pay their proportionate share of the processing costs charged by midstream companies to remove natural gas liquids from the gas extracted from the Class wells. This issue can be resolved on a class-wide basis because Key commingles the gas extracted from the Class wells before the processing occurs. As a result, although the quality of gas from an individual well may differ, it is subject to the same processing after it is commingled with gas from other Class wells. Class members contend that this processing is necessary to make the gas into a marketable product and that their gas is not sold until after the processing is completed. Class members supported their contention with evidence. Key supported its opposition to the class certification motion with evidence as well. However, the district court found that the Class members' evidence was more persuasive. The district court's findings of fact are not against the clear weight of the evidence and Key has not demonstrated that the class certification order results from an error of law.

¶62 The district court's order certifying a class of royalty owners is affirmed.

¶63 AFFIRMED.

WISEMAN, J. (sitting by designation), and BLACKWELL, J. (sitting by designation) concur.

 

FOOTNOTES

[1] Key argues, without citation to supporting evidence in the record, that the industry custom when many of the World War II era Class leases were executed, including Hitch's, "was to pay royalty on the value of unprocessed gas." (emphasis in original). "Facts stated in the Summary of the Record must be supported by citation to the record where such facts occur." Okla. Sup. Ct. R. 1.11(e), 12 O.S. Supp. 2020, ch. 15, app. 1. Key cannot escape this obligation by omitting facts from the summary of the record material to its argument while including those facts only in the argument portion of its brief. "The brief of the moving party shall contain a Summary of the Record, setting forth the material parts of the pleadings, proceedings, facts and documents upon which the party relies, together with such other statements from the record as are necessary to a full understanding of the questions presented to this Court for decision." Id. If Key has evidence of industry custom and usage relevant to the interpretation of the royalty clause of any of the Class leases, it can present that evidence at trial. We will not consider Key's "custom and usage" argument in this appeal. "In case of failure to comply with any rule or order of the Court, the Court may . . . take any other action it deems proper." Okla. Sup. Ct. R. 1.2, 12 O.S. Supp. 2020, ch. 15, app. 1. Further, Bowden v. Phillips Petroleum Company, 247 S.W.3d 690 (Tex. 2008), cited in support of the contention that one of Hitch's leases has been determined by the Supreme Court of Texas to pay on unprocessed gas is of questionable relevance. The Texas view of the relationship between a royalty owner and its lessor with respect to the duty to market was rejected by the Oklahoma Supreme Court. TXO Prod. Corp. v. State ex rel. Comm'rs of the Land Office, 1994 OK 131, 903 P.2d 259.

[2] For convenience, we include in our analysis of the leases subject to the implied covenant of marketability those leases which expressly prohibit Key from charging production costs, including the processing costs at issue in this case. Although there is no implied contract term in those particular leases determining whether Key can charge Class members for processing costs, the legal analysis of that issue is the same. If the processing costs are production costs, the implied covenant and the terms of those leases prohibit Key from passing those costs on to Class members.

[3] At the request of the parties, the district court did not hold an evidentiary hearing to obtain testimony in court from the parties' witnesses, but decided Hitch's motion on the basis of the parties' written submissions and the arguments of their counsel.

[4] Throughout this Opinion, we rely on federal precedent interpreting the federal class action statute, when appropriate, for the interpretation of section 2023. "Oklahoma's class action statute, § 2023, closely parallels Rule 23 of the Federal Rules of Civil Procedure. The Court may therefore look to federal authority for guidance regarding the interpretation of § 2023." Cactus Petroleum Corp. v. Chesapeake Operating, Inc., 2009 OK 67, n.8, 222 P.3d 12.

[5] In addition to lessors who specifically agreed to pay their proportionate share of the processing fees, certain other individuals or entities were also excluded from the Class. Those exclusions do not affect the analysis of the class certification order.

[6] Mittelstaedt v. Santa Fe Minerals, Inc., 1998 OK 7, 954 P.2d 1203; TXO Prod. Corp. v. State ex rel. Comm'rs of the Land Office, 1994 OK 131, 903 P.2d 259; Wood v. TXO Prod. Corp., 1992 OK 100, 854 P.2d 880.

[7] In the district court, Hitch filed a motion for summary judgment arguing that Pummill v. Hancock Expl. LLC had preclusive effect because Key's parent company, Cimerex Energy Company, was a defendant in Pummill. Both parties address the issue in their appellate briefing. However, the district court specifically declined to rule on that issue when deciding to certify the class that is the subject of this appeal, and so do we. (Order Granting Class Certification, ¶ 66, n.8). Consequently, any preclusive effect of Pummill is not an issue we will address. See Evers v. FSF Overlake Assocs., 2003 OK 53, ¶ 18, 77 P.3d 581 ("[I]t is not the duty of the appellate court on review to make first-instance determinations of disputed law or fact issues.").

[8] In the absence of disputed evidence, unlike in this case, '"courts should engage that question as a matter of summary judgment, not class certification."' Tyson Foods, Inc. v. Bouaphakeo, 577 U.S. 442, 457, 136 S. Ct. 1036, 1047 (quoting Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 107 (2009)).

[9] In its brief in chief, Key contends that Hitch is not an adequate class representative because the royalty clauses covering its two wells are different from all but fifteen of the 3,032 Class leases. If, as Hitch alleges, those two royalty clauses are subject to the implied covenant like all of the remaining 3,017 Class leases, Key has failed to show at this stage that Hitch cannot "fairly and adequately protect the interests of the class." 12 O.S.2021 § 2023(A)(4). More importantly, Key has not addressed the adequacy of Hitch's counsel to conduct this litigation. "Realistically, for purposes of determining adequate representation, the performance of class counsel is intertwined with that of the class representative. As the Seventh Circuit explained, '[e]xperience teaches that it is counsel for the class representative and not the named parties, who direct and manage these actions.'" Pelt v. Utah, 539 F.3d 1271, 1288 (10th Cir. 2008) (quoting Culver v. City of Milwaukee, 277 F.3d 908, 913 (7th Cir. 2002)). Key did not raise this argument in the district court, and we do not address it here. See Evers v. FSF Overlake Assocs., 2003 OK 53, ¶ 18, 77 P.3d 581.

[10] The companion case, Chieftain Royalty Company v. XTO Energy, Inc., 528 Fed.Appx. 938 (10th Cir. 2013), was decided on the basis of Oklahoma law and reached the same result; class certification was not precluded if, on remand, the district court actually examined all of the leases and found that a sufficient number of leases were subject to the implied covenant to market and the alleged breach of that covenant could be established by proof of the illegality of the defendant's uniform payment methodology.

 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Court of Civil Appeals Cases

 
Cite
Name
Level

 
2008 OK CIV APP 112, 216 P.3d 292, 
NEW DOMINION, L.L.C. v. PARKS FAMILY COMPANY, L.L.C.
Discussed

 
2012 OK CIV APP 94, 287 P.3d 1033, 
PANOLA INDEPENDENT SCHOOL DIST. NO. 4 v. UNIT PETROLEUM CO
Discussed at Length

 
2017 OK CIV APP 53, 405 P.3d 131, 
STRACK v. CONTINENTAL RESOURCES, INC.
Discussed at Length

 
2018 OK CIV APP 48, 419 P.3d 1268, 
PUMMILL v. HANCOCK EXPLORATION LLC
Discussed at Length

 
2018 OK CIV APP 65, 429 P.3d 703, 
WHISENANT v. STRAT LAND EXPLORATION CO.
Discussed at Length

Oklahoma Supreme Court Cases

 
Cite
Name
Level

 
1998 OK 7, 954 P.2d 1203, 69 OBJ 490, 
MITTELSTAEDT v. SANTA FE MINERALS, INC.
Discussed at Length

 
1992 OK 100, 854 P.2d 880, 63 OBJ 2023, 
Wood v. TXO Production Corp.
Discussed at Length

 
1994 OK 131, 903 P.2d 259, 65 OBJ 3972, 
TXO Production Corp. v. State ex rel. Com'rs of Land Office
Discussed at Length

 
2001 OK 113, 41 P.3d 366, 72 OBJ 3685, 
SCOUFOS v. STATE FARM FIRE & CASUALTY CO.
Discussed at Length

 
1970 OK 180, 475 P.2d 396, 
JOHNSON v. JERNIGAN
Discussed at Length

 
2003 OK 53, 77 P.3d 581, 
EVERS v. FSF OVERLAKE ASSOCIATES
Discussed at Length

 
2004 OK 92, 112 P.3d 1154, 
HOWELL v. TEXACO, INC.
Discussed at Length

 
2006 OK 24, 164 P.3d 1028, 
HARVELL v. GOODYEAR TIRE & RUBBER CO.
Discussed at Length

 
2006 OK 66, 151 P.3d 92, 
BURGESS v. FARMERS INSURANCE COMPANY, INC.
Discussed

 
2008 OK 67, 195 P.3d 48, 
MASQUAT v. DAIMLERCHRYSLER CORP.
Discussed

 
2009 OK 67, 222 P.3d 12, 
CACTUS PETROLEUM CORP. v. CHESAPEAKE OPERATING, INC.
Discussed

 
2014 OK 49, 338 P.3d 613, 
STATE ex rel. PRUITT v. NATIVE WHOLESALE SUPPLY
Discussed

 
2014 OK 88, 339 P.3d 878, 
MARSHALL COUNTY v. HOMESALES, INC.
Discussed at Length

 
1981 OK 65, 630 P.2d 1269, 
Tara Petroleum Corp. v. Hughey
Discussed at Length

 
1999 OK 36, 981 P.2d 301, 70 OBJ 1445, 
Sides v. John Cordes, Inc.
Discussed

Title 12. Civil Procedure

 
Cite
Name
Level

 
12 O.S. 2023, 
Class Actions
Discussed at Length

 
12 O.S. 2101, 
Short Title
Cited

Title 52. Oil and Gas

 
Cite
Name
Level

 
52 O.S. 570.1, 
Short Title
Cited

 
 

 
 
 
 

 
 

 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA